# No. 14-5127

## IN THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LOUIS J. BALESTRA, JR. AND PHYLLIS M. BALESTRA,
*Plaintiffs-Appellants,*

v.

UNITED STATES OF AMERICA,
*Defendant-Appellee.*

On Appeal from the Judgment of the
United States Court of Federal Claims
No. 09-283; Judge Victor J. Wolski

## APPELLANTS' OPENING BRIEF

Mary E. Monahan – Counsel of Record
Adam B. Cohen
Rich Sun
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, NW, Suite 700
Washington, DC  20001-3980
Tel: (202) 383-0100
Fax: (202) 637-3593

*Counsel for Plaintiffs-Appellants*
October 14, 2014

# CERTIFICATE OF INTEREST

Counsel for Appellants certifies the following:

1.      The full name of every party or amicus represented by me is:

<u>Louis J. Balestra, Jr. and Phyllis M. Balestra</u>

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

<u>Louis J. Balestra, Jr. and Phyllis M. Balestra</u>

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

<u>Not applicable</u>

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency are expected to appear in this court are:

<u>Mary E. Monahan, Adam B. Cohen and Rich Sun of Sutherland Asbill & Brennan LLP</u>

Dated:  October 14, 2014           <u>/s/ Mary E. Monahan</u>
                                    Mary E. Monahan
                                    *Attorney for Plaintiffs-Appellants*

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ..................................................................... v

STATEMENT OF RELATED CASES ...................................................... 1

JURISDICTIONAL STATEMENT .......................................................... 1

STATEMENT OF THE ISSUE ................................................................ 2

INTRODUCTION ..................................................................................... 2

STATEMENT OF THE CASE .................................................................. 7

STATEMENT OF THE FACTS ................................................................ 8

      Terms of the United Retirement Plans ........................................... 9

      United's Bankruptcy ....................................................................... 9

      Calculations Made at the Time of Mr. Balestra's Retirement ...... 11

      Termination of the Qualified and Nonqualified Plans ................. 14

      Termination of Benefits Payments ............................................... 17

SUMMARY OF THE ARGUMENT ....................................................... 18

ARGUMENT ......................................................................................... 21

     I.     Standard of Review ............................................................. 21

     II.    Background ......................................................................... 21

          A.    FICA In General .......................................................... 21

          B.    Section 3121(v)(2) ...................................................... 23

               1.    Purpose of §3121(v)(2) ...................................... 24

2.  Congress Indicated That the Amount Deferred for a Nonaccount Balance Plan Should Be the Present Value "As In Many Other Areas of Our Tax Law" ............................ 29

C.  The Regulations ........................................... 31

D.  Generally Applicable Tax Rules Regarding Valuation ................................................... 34

III.  The Regulation is Invalid or Inapplicable To Deferred Compensation From a Bankrupt Employer. ........................ 37

A.  The Regulation Conflicts With The Purpose and History of Section 3121(v)(2), Which Indicate that Present Value Should be Determined in the Same Way as in Other Provisions of the Code ..................... 38

B.  Regulations May Not Impose an Unreasonable and Unrealistic Measure of Value Unless Supported by a Clear Expression of Legislative Intent ........................................................ 42

1.  The Supreme Court in *Cartwright* Invalidated a Regulation That Conflicted with the General Definition of Fair Market Value. ............................................... 43

2.  The Fifth and Tenth Circuits in *McDonald* and *Gresham* Invalidated a Regulation Similar To Reg. §31.3121(v)(2)-1(c)(2)(ii) Because It Conflicted With the General Meaning of Fair Market Value. .......................... 47

IV.  The Regulation is Arbitrary and Capricious Because Treasury Did Not Provide a Satisfactory Explanation for Its Departure from the Plain Meaning of the Term "Present Value." ................................................. 52

A.  General Statements Regarding Administrative Convenience Are Not a Sufficient Explanation ........... 54

B.    Post-Hoc Rationalizations Are Not a Sufficient
            Explanation ................................................................. 57

CONCLUSION ......................................................................... 59

STATUTORY ADDENDUM ...................................................... 60

CERTIFICATE OF SERVICE .................................................. 63

CERTIFICATE OF COMPLIANCE ......................................... 64

CIRCUIT RULE 28(A)(12) ADDENDUM ................................. A

    Judgment (June 5, 2014, ECF No. 88) ........................ A-1

    Memorandum Opinion and Order (May 31, 2014, ECF
          No. 87) ................................................................. A-2

# TABLE OF AUTHORITIES

CASES                                                                  Page(s)

*Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607 (1944) ............ 55

*American Home Prods. Corp. v. United States*, 601 F.2d 540 (Ct. Cl. 1979) ................................................................................... 34

*Anderson v. United States*, 929 F.2d 648 (Fed. Cir. 1991) ..................... 22

*Babbitt v. Sweet Home Chapter of Cmtys for a Greater Oregon*, 515 U.S. 687 (1995) ...................................................................... 38

*Bubble Room, Inc. v. United States*, 159 F.3d 553 (Fed. Cir. 1998) ...... 21

*Central Ill. Pub. Serv. Co. v. United States*, 435 U.S. 21 (1978) ........... 22

*Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ................................................................................. *passim*

*Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955) ................. 36

*Corliss v. Bowers*, 281 U.S. 376 (1930) .................................................. 23

*Dominion Resources, Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012) .............................................................................. *passim*

*Energy Capital Corp. v. United States*, 302 F.3d 1314 (Fed. Cir. 2002) ........................................................................................... 37

*Estate of Gresham v. Commissioner*, 752 F.2d 518 (10th Cir. 1985) ...................................................................................... 47-50

*Estate of Ridgely v. United States*, 180 Ct. Cl. 1220 (1967) ................. 36

*Estate of Silverman v. Commissioner*, 98 T.C. 54 (1992) ...................... 23

*Goldsmith v. United States*, 586 F.2d 810 (Ct. Cl. 1978) ...................... 23

*Green v. Commissioner*, 22 T.C. 728 (1954) .......................................... 46

*Gudmundsson v. United States*, 634 F.3d 212 (2d Cir. 2011) ............... 47

*Hanley v. United States*, 63 F. Supp. 73 (Ct. Cl. 1945) .......................... 46

*Harrison v. United States*, 475 F. Supp 408 (E.D. Pa. 1979, *aff'd without published opinion*, 620 F.2d 288 (3d Cir. 1980) .............. 48

*Helvering v. Davis*, 301 U.S. 619 (1937) ................................................ 22

*Huntington Nat. Bank v. Commissioner*, 13 T.C. 760 (1949) ................ 46

*In re Aloha Airgroup, Inc.*, 2005 WL 3487724 (Br. D. Haw. 2005), *memorandum, but not order, vacated pursuant to consent motion*, 2006 WL 695054 (D. Haw. 2006) ...................................... 10

*In re Delta Air Lines, Inc.*, 2006 WL 2564116 (Br. S.D.N.Y. Sept. 5, 2006) ........................................................................................ 10

*In re UAL Corp.*, 428 F.3d 677 (7th Cir. 2005) ........................................ 9

*In re UAL Corp (Pilots' Pension Plan Termination)*, 468 F.3d 444 (7th Cir. 2006) ........................................................... 11, 16, 17, 51

*In re US Airways Group, Inc.*, 296 B.R. 734 (Br. E.D. Va. 2003) ........... 10

*Judulang v. Holder*, 132 S. Ct. 476 (2011) ............................................ 53

*Kolom v. Commissioner*, 71 T.C. 235 (1978), *aff'd*, 644 F.2d 1282 (9th Cir. 1981) ................................................................................ 48

*Koopman v. United States*, No 09-333 (Fed. Cl. filed May 26, 2009) ............................................................................................. 1, 7

*Mayo Foundation for Medical Educ. & Res. v. United States*, 562 U.S. 44 (2011) .............................................................................. 37

*McDonald v. Commissioner*, 764 F.2d 322 (5th Cir. 1985) .............. 47-50

*Motor Vehicle Mfrs Ass'n v. State Farm Mutu. Auto. Ins. Co.*, 463 U.S. 29 (1983) ....................................................................... 20, 52-58

*Murphy v. Internal Revenue Service*, 493 F.3d 170 (D.C. Cir. 2007) .... 36

*National Org. of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs*, 669 F.3d 1340 (Fed. Cir. 2012) ......................................... 53

*Navajo Tribe of Indians v. United States*, 364 F.2d 320 (Ct. Cl. 1966) ........................................................................ 36

*O'Reilly v. Commissioner*, 973 F.2d 1403 (8th Cir. 1992) ...................... 45

*Pension Benefit Guar. Corp. v. United Airlines,* 436 F. Supp. 2d 909 (N.D. Ill. 2006) ........................................................ 16

*Rowan Cos., Inc. v. United States*, 452 U.S. 247 (1981) ........................ 22

*Rust v. Sullivan*, 500 U.S. 173 (1991) ...................................... 38

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) ............................... 53

*Sofman v. United States*, No. 10-157 (Fed. Cl. filed Mar. 12, 2010) .... 1, 7

*State of Wash. v. Commissioner*, 77 T.C. 656 (1981), *aff'd*, 692 F.2d 128 (D.C. Cir. 1982) ....................................................... 46

*Steinberg v. United States*, 606 F. Supp. 228 (E.D. Mo. 1985) .............. 47

*United States v. Walter A. Bates & Sandra J. Bates*, No. 8:12-CV-00833-MSS-TBM (M.D. Fla. Filed Apr. 17, 2012) ........................... 1

*United States v. Cartwright*, 411 U.S. 546 (1973) ......................... *passim*

*United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001) ................................................................. 22, 23

*United States v. Hudson*, 299 U.S. 498 (1937) ....................... 35

## Statutes

5 U.S.C. §706(2)(A) .......................................................... 52

11 U.S.C. §1113 .............................................................. 11

Internal Revenue Code of 1986, 26 U.S.C. §§ 1 *et. seq.*

Section 57(a)(6) ......................................................... 47

Section 83 ...................................................................... 48

Section 83(a)(1)............................................................. 48

Section 3101 ............................................................. 2, 21

Section 3101(a) ................................................... 14, 21, 22

Section 3101(b) ...................................................... 14, 21

Section 3101(b)(2)........................................................ 21

Section 3121(a) ...................................................... 22, 23

Section 3121(a)(1) ................................................... 14, 21

Section 3121(a)(2)(A) ................................................... 25

Section 3121(a)(3) ........................................................ 25

Section 3121(a)(9) ....................................................... 25

Section 3121(v)(2)................................................. *passim*

28 U.S.C. §1295(a)(3)...................................................... 1

28 U.S.C. §1346(a)(1)...................................................... 1

28 U.S.C. §1491 ........................................................... 1

29 U.S.C. §1341(c)(2)(B)(iv).............................................. 11

## LEGISLATIVE MATERIALS

Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66,
    107 Stat. 312................................................................ 30

Social Security Amendments of 1983, Pub. L. No. 98-21, 97
    Stat. 65 ..................................................................... 25

H.R. REP NO. 615, 74th Cong., 1st Sess. (1935) ....................... 22

H.R. Conf Rep. No. 47, 98th Cong., 1st Sess. (1983) ........................ 25, 28

S. Rep. No. 628 (1935), 74th Cong., 1st Sess. (1935) .............................. 22

129 Cong. Rec. S6134 (daily ed. Mar. 18, 1983) ........................... *passim*


## Federal Regulations

Treasury Regulations, 26 C.F.R. §§ 1 *et. seq.*

Reg. §1.57(f)(3) ..................................................................... 48

Reg. §1.170A-1(c)(2) ............................................................ 34, 35

Reg. §20.2031-2(f) ................................................................. 34

Reg. §25.2512-2(f) ................................................................. 34

Reg. §31.3101-3 ..................................................................... 22

Reg. §31.3121(v)(2)-1(b)(3)(ii) .............................................. 32

Reg. §31.3121(v)(2)-1(c) ........................................................ 11

Reg. §31.3121(v)(2)-1(c)(1)(i) ............................................... 12

Reg. §31.3121(v)(2)-1(c)(2)(i) .............................................. 12, 32

Reg. §31.3121(v)(2)-1(c)(2)(ii) ............................................. *passim*

Reg. §31.3121(v)(2)-1(c)(1)(ii)(A) ........................................ 12, 56

Reg. §31.3121(v)(2)-1(e)(4)(i)(A) ......................................... 12

Reg. §31.3121(v)(2)-1(e)(4)(i)(B) ......................................... 13

Proposed Treasury Regulations

Prop. Reg. §1.409A-4(b)(2) ................................................... 34

Prop. Reg. §1.409A-4(g)(1) ................................................... 34

OTHER AUTHORITIES

Notice 94-96, 1994-2 C.B. 564 ................................................................. 31

Notice of Proposed Rulemaking, 61 Fed. Reg. 2194 (Jan. 25, 1996) ...................................................................... 31, 54

Final Regulations, 64 Fed. Reg. 4542, T.D. 8814, 1999-1 C.B. 601 (Jan. 29, 1999) ................................................... 31, 57, 58

*ARCO Suggests Changes to Deferred Compensation FICA Regs*, 96 Tax Notes Today 140-28 (June 20, 1996) ....................................... 56

## STATEMENT OF RELATED CASES

No other appeal in or from the same civil action or proceeding in the lower court was previously before this or any other appellate court. Counsel for plaintiff-appellant is aware of two other cases, collectively involving more than a hundred similarly situated taxpayers, which will be directly affected by this Court's decision in the pending appeal. *Koopman v. United States*, No 09-333 (Fed. Cl. filed May 26, 2009), *Sofman v. United States*, No. 10-157 (Fed. Cl. filed Mar. 12, 2010). Counsel for plaintiff-appellant is also aware of another case, *United States v. Walter A. Bates & Sandra J. Bates*, No. 8:12-CV-00833-MSS-TBM (M.D. Fla. Filed Apr. 17, 2012), which involves a single taxpayer.

## JURISDICTIONAL STATEMENT

The Court of Federal Claims had jurisdiction over this tax refund action pursuant to 28 U.S.C. §§ 1491 and 1346(a)(1). The order appealed from is a judgment in favor of defendant-appellant, the United States, entered on June 5, 2014. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. §1295(a)(3).

## STATEMENT OF THE ISSUE

For purposes of determining the amount treated as wages under 26 U.S.C. §3121(v)(2)[1] and subject to tax under the Federal Insurance Contributions Act (FICA), 26 U.S.C. §3101, whether Reg. §1.3121(v)(2)-1(c)(2)(ii),[2] which prohibits consideration of the financial condition of the employer, is valid as applied to determine the "present value" of a right to receive nonqualified deferred compensation payments from a bankrupt employer.

## INTRODUCTION

The taxpayer in this case is a pilot who retired from United Airlines (United) on October 1, 2004, when United was midway through its four-year bankruptcy proceeding.  On his retirement date, the taxpayer was legally entitled to receive a monthly nonqualified deferred compensation payment for life under United's nonqualified retirement plan.  No assets were set aside to fund benefits under the nonqualified plan; as to any future payments, the taxpayer was an unsecured

---

[1] Unless otherwise stated, all § references are to the Internal Revenue Code of 1986, 26 U.S.C. §§1 *et. seq.*, as amended and in effect in 2004.

[2] All "Reg." references are to the Treasury regulations as amended and in effect in 2004.

2

general creditor of United.  In August 2004, before the taxpayer's retirement date, United had indicated to the Pension Benefit Guaranty Corporation (PBGC) that it would likely need to terminate its retirement plans in order to secure exit financing and emerge from bankruptcy.  On December 30, 2004, the PBGC asked the bankruptcy court to terminate the related qualified retirement plan.  The court eventually terminated the qualified plan and held that the nonqualified plan terminated automatically, effective December 30, 2004.  This terminated the taxpayer's right to receive any further benefits under the nonqualified plan.

Under §3121(v)(2), the "amount deferred" under the nonqualified deferred compensation plan at the time of the taxpayer's retirement was subject to FICA tax.  For a "nonaccount balance" plan such as the one covering the taxpayer, no specific amount is "deferred" periodically, as would be the case under an "account balance" plan.  Rather, the taxpayer is treated as having "deferred" the additional amount of compensation he is entitled to receive after retirement under the plan, calculated at the time there was no longer a "substantial risk of forfeiture" and when the amount was "reasonably ascertainable."  The

regulations refer to this date as the "resolution date," which in this case was the employee's retirement date.

Section 3121(v)(2) itself is silent regarding the calculation of the amount deferred, but the legislative history indicates that, for nonaccount balance plans such as the one here, the amount deferred is the present value of the future payment stream, determined as of the retirement date.

The regulations confirm that "present value" is the appropriate measure of the "amount deferred" and require that the present value be computed "using actuarial assumptions and methods that are reasonable." In determining present value, however, the regulations prohibit any discount for the probability that future payments will not be made (or will be reduced) because of the unfunded status of the plan or the risk that the employer will be unable to pay. Reg. §31.3121(v)(2)-1(c)(2)(ii).

As computed under the regulations, the present value of the taxpayer's right to receive future payments was $289,601 on his retirement date. The taxpayer ultimately received only $63,032, due to the premature termination of the plan by the bankruptcy court.

Using the concept of fair market value generally applicable under the Internal Revenue Code, value for tax purposes should approximate the amount that would be received in a transaction between a hypothetical willing buyer and willing seller. *United States v. Cartwright*, 411 U.S. 546 (1973). The regulations can validly adopt standardized methods of calculating present value, such as the mortality tables and interest rate used here, but only where such methods do not produce a result that is so economically unreasonable and unrealistic that it violates the general willing buyer-willing seller standard. *See id.*

In the instant case, the Court of Federal Claims held that the regulation precluding a discount to reflect the risk of non-payment was valid as applied to an employer in bankruptcy, as a reasonable interpretation of the statute. *See Chevron, U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The court reasoned that, because the statute was silent regarding the amount to be subject to FICA tax, <u>any</u> present value method providing for a discount rate would be a permissible interpretation, whether or not it conformed to the generally applicable standard for determining value. (A-011; JA011.)

5

In determining that the Treasury had provided a "sufficient and cogent rationale" as required under the Administrative Procedure Act, for its choice to disregard the employer's financial condition in all cases, including bankruptcy, the court relied on a single, generalized assertion in the Preamble that the regulations as a whole promoted administrative convenience, as well as the court's own observation that the regulations might also prevent abuse. (A-012; JA 012.). The court erroneously ignored decades of authority, including the Supreme Court's decision in *Cartwright*, establishing that regulatory methods of determining value, even if generally valid, cannot be applied where they produce an economically unreasonable and unrealistic value. (A-011; JA 011.)

The result of the Court of Federal Claims decision is that the taxpayer is subject to tax on $289,601, reflecting a present value that no economically rational willing buyer would have paid for the rights of an unsecured creditor such as the taxpayer at the time of his retirement.

## STATEMENT OF THE CASE

On May 5, 2009, the taxpayers, Louis J. Balestra, Jr. and Phyllis M. Balestra[3] filed a complaint in the Court of Federal Claims seeking a refund of $3,285.26 of Federal Insurance Contribution Act (FICA) taxes for 2004, following the denial of a timely-filed administrative claim for refund.  (A-003-004, JA 116-117.)  The issue in this case is present in two other cases involving more than a hundred similarly situated taxpayers, currently pending in the Court of Federal Claims.[4]

On May 31, 2014, the court (Judge Victor J. Wolski) issued a Memorandum Opinion and Order on cross-motions for summary judgment, denying Mr. Balestra's motion and granting the United

---

[3] Louis and Phyllis Balestra are husband and wife and filed a joint federal income tax return for 2004.  Because this action concerns Mr. Balestra's retirement benefits, the plaintiffs will be referred to singly as "Mr. Balestra."

[4] Mr. and Mrs. Balestra are the sole plaintiffs in the instant case.  The other retirees have collectively filed two cases, *Koopman v. United States*, No 09-333 (Fed. Cl. filed May 26, 2009) and *Sofman v. United States*, No. 10-157 (Fed. Cl. filed Mar. 12, 2010).

States's motion.  (A-002; JA 002.)  Judgment in favor of the United

States was entered on June 5, 2014.  (A-001; JA 001.)[5]

## STATEMENT OF THE FACTS

Mr. Balestra was employed as a pilot by United from January 29,

1979 until his retirement on October 1, 2004.  (A-003; JA 003.)  On his

retirement date, Mr. Balestra had the right to receive benefits under

two United retirement plans:  a qualified plan (the Qualified Plan) and

a supplemental, nonqualified plan (the Nonqualified Plan).  (JA 072,

095-096.)[6]  The United retirement plans were mandated by the

collective bargaining agreement between United and the Air Line

Pilots' Association International (ALPA).  (JA 068-069, 095-096, 100.)

The FICA taxation of Mr. Balestra's right to receive benefits under the

Nonqualified Plan, specifically the value of such benefits to be included

---

[5] Mr. Balestra is not appealing the court's holding with respect to the timing of inclusion of nonqualified deferred compensation in income for FICA purposes.  (*See* A-008-011; JA 008-011.)

[6] In the Court of Federal Claims, the parties filed responsive proposed findings of uncontroverted fact, which, after all responses had been filed, were essentially undisputed.  (A-003; JA 003; *see* JA 025-033, 060-124.)

in income for FICA purposes as of his retirement date, is the issue in this case.

## Terms of the United Retirement Plans

The Qualified Plan was required to be funded according to certain standards. (JA 095-096.) Benefits were insured, to a certain extent, by the PBGC. *In re UAL Corp.,* 428 F.3d 677, 680 (7th Cir. 2005).

The Nonqualified Plan was not funded and not insured. Obligations under the Nonqualified Plan were reflected on United's books as general, unsecured obligations. No assets of United were set aside for payment of benefits under the Nonqualified Plan; participants in that plan were treated as unsecured general creditors of United for bankruptcy purposes. (JA048, 120-121.)

## United's Bankruptcy

On October 1, 2004, Mr. Balestra's retirement date, United had been under bankruptcy protection for nearly two years, having filed under chapter 11 on December 9, 2002. (A-003; JA 003; JA 075, 104.) United's bankruptcy was prompted by the severe economic difficulty it experienced after the September 11, 2001 attacks, including multi-billion dollar operating losses, a severe downgrade in its credit rating,

and an inability to obtain financing in the capital markets. (JA 108-109, 123-124).

The airline industry in general experienced significant financial difficulties after the September 11, 2001 attacks. In the same time period as United's bankruptcy proceeding, three other airlines obtained court approval of the distress termination of their pilots' qualified retirement plans. *See In re Delta Air Lines*, Inc., 2006 WL 2564116 (Br. S.D.N.Y. Sept. 5, 2006) (approving distress termination of Delta Air Lines pilots' qualified retirement plan); *In re Aloha Airgroup, Inc.*, 2005 WL 3487724 (Br. D. Haw. 2005) (approving distress termination of Aloha Airlines pilots' qualified retirement plan), *memorandum, but not order, vacated pursuant to consent motion*, 2006 WL 695054 (D. Haw. Mar. 14, 2006); *In re US Airways Group, Inc.*, 296 B.R. 734 (Br. E.D. Va. 2003) (approving distress termination of US Airways pilots' qualified retirement plan). One of the requirements for approval of a distress termination of a qualified retirement plan is a determination by the bankruptcy court that, unless the qualified plan is terminated, the employer will be unable to pay all its debts pursuant to a plan of

reorganization and will be unable to continue in business outside the chapter 11 reorganization process. *See* 29 U.S.C. §1341(c)(2)(B)(iv).

The requirements applicable to distress terminations of qualified retirement plans are not applicable to nonqualified plans. If the nonqualified plan is part of a collective bargaining agreement, however, court approval is required for rejection of the agreement. *See* 11 U.S.C. §1113. Employees entitled to receive payments under a nonqualified plan are treated as general unsecured creditors. *See In re UAL Corp.,* 468 F.3d at 455.

## Calculations Made at the Time of Mr. Balestra's Retirement

Under the regulations, United was required to calculate for FICA purposes, as of October 1, 2004, the present value of the expected amounts of Mr. Balestra's benefits under the Nonqualified Plan.[7] In the terminology of the regulations, the Nonqualified Plan was a "nonaccount balance plan." *See* Reg. §31.3121(v)(2)-1(c).

---

[7] In the Court of Federal Claims, Mr. Balestra argued in the alternative that a date other than his retirement date would have been the appropriate time to include his retirement benefit in income for FICA purposes. (*See* A-008-011; JA 008-011.) Mr. Balestra is not appealing on this issue.

An "account balance plan" involves a nominal principal amount credited to an individual account for an employee. Income is then credited or debited to the account, and benefits payable are based solely on the balance in the account. Reg. §31.3121(v)(2)-1(c)(1)(ii)(A). The regulations generally provide that, for an account balance plan, the "amount deferred" for a particular period is the nominal principal amount credited to the employee's account for the period, increased or decreased by any income attributable to the principal amount. Reg. §31.3121(v)(2)-1(c)(1)(i).

A nonaccount balance plan is any plan other than an account balance plan. *See* Reg. §31.3121(v)(2)-1(c)(2)(i). Mr. Balestra did not have an individual account balance; his monthly retirement benefit was determined based on his final average earnings and years of participation. (JA 098.) For a nonaccount balance plan, the regulations require the employer to determine the present value of the future payments to which the employee has a legally binding right at the time there is no remaining substantial risk of forfeiture and the amount deferred is "reasonably ascertainable," a date referred to in the regulation as the "resolution date." Reg. §31.3121(v)(2)-1(e)(4)(i)(A). An

12

amount is considered to be reasonably ascertainable if the "amount, form and commencement date" of the benefit payments are known. Reg. §31.3121(v)(2)-1(e)(4)(i)(B).

At the time of Mr. Balestra's retirement, there was no remaining substantial risk of forfeiture and the amount deferred had become reasonably ascertainable.  Under the terms of the plan, and considering a $14,175 initial payment Mr. Balestra had elected to take on retirement, United calculated that Mr. Balestra would receive $1,675.24 in monthly benefits for life.  (JA 035, 055.)  Although this amount can be referred to as an "annuity," it differs from commercial annuities offered by insurance companies in that, unlike a commercial annuity, no assets were required to be held in reserve to fund the payments.  (JA 102-103).

To calculate the present value of the monthly benefit for purposes of determining the "amount deferred" subject to FICA, United used a discount rate of 4.26% (120% of the Applicable Federal Midterm Rate as of the previous December) and a mortality table.[8]  In conformity with

---

[8] At the time, United's bankruptcy financing, which was fully secured by specified United assets, bore a rate of about 7 percent.  (JA 109-110.)

the regulations, the 4.26% rate disregarded any probability that payments would not be made (or would be reduced) because of the unfunded status of the Nonqualified Plan, or the risk that United would be unwilling or unable to pay benefits because of its bankruptcy.  The result of the calculation was a present value of $289,601 (JA 053-059.)  In November 2004, United withheld $4,199 in FICA tax from the $14,175 initial payment, representing 1.45% of the $289,601 present value of the amount deferred.[9]  (JA039, 113-114.)

## Termination of the Qualified and Nonqualified Plans

By 2004, United was attempting to negotiate $2 billion in financing to allow it to exit bankruptcy.  (JA 112.)  United's ability to obtain this financing depended in part on shedding its existing, underfunded retirement plans.  (JA 111-112.)  In June 2004, after rejection of United's request for a federal loan guarantee, United's bankruptcy lenders prohibited any further plan contributions, resulting in increasing levels of underfunding.  (JA 111.)  In a meeting with the

---

[9] The 1.45% rate is the Hospital Insurance (HI) portion of FICA imposed under §3101(b).  No Old Age, Survivor's and Disability Insurance (OASDI) was due under §3101(a) because Mr. Balestra's other wages during the year had already met the cap on wages subject to OASDI. §3121(a)(1).  (A-003-004; JA 003-004.)

PBGC in August 2004, two months before Mr. Balestra's retirement, United predicted that, to exit bankruptcy, it would need to terminate all its retirement plans. (JA 112.)

On November 24, 2004, United asked the bankruptcy court to approve a termination of many of its collective bargaining agreements, including the ALPA agreement mandating both the Qualified and Nonqualified Plans. (JA 080, 081, 105.) United simultaneously pursued negotiations with ALPA that resulted in a modified collective bargaining agreement, which made certain changes to the Qualified and Nonqualified Plans. The modified agreement was approved by the bankruptcy court on December 17, 2004. (*Id.*)

On December 30, 2004, the PGBC filed suit in the Northern District of Illinois seeking an involuntary distress termination of the Qualified Plan, effective as of that date. PGBC asserted that the Qualified Plan was underfunded by $2.9 billion on a termination basis, and that continuation of the plan after the end of 2004 would increase the PBGC's liability with respect to that plan—an implicit acknowledgement that United would ultimately terminate the plan and the PBGC would be required to take it over. (JA 082-083.)

On June 13, 2006, the district court accepted the recommendation of the bankruptcy court and granted the PBGC's request to terminate the Qualified Plan as of December 30, 2004.  The district court accepted the bankruptcy court's finding that the PBGC had proved by a preponderance of the evidence that the plan was likely to terminate. The district court held that the bankruptcy court had properly considered that United had been in bankruptcy since December of 2002, that United had announced that it needed to terminate all its pension plans in order to successfully emerge from bankruptcy; that United had initiated a proceeding to reject its collective bargaining agreements, and that United's business plan in August of 2004 did not provide for any pension contributions.  (JA 082-083); *Pension Benefit Guar. Corp. v. United Airlines*, 436 F. Supp. 2d 909, 921 (N.D. Ill. 2006).

The PBGC, ALPA, the United Retired Pilots Benefit Protection Association and United all appealed from the district court's order, which was sustained by the Seventh Circuit.  *In re UAL Corp.,* 468 F.3d at 452.  The Seventh Circuit stated that the requirements for a distress termination of the qualified plan had been met, *i.e.*, that unless the qualified plan was terminated, United would be unable to pay all its

16

debts pursuant to a plan of reorganization and would be unable to continue in business outside the chapter 11 reorganization process. *In re UAL Corp.*, 468 F.3d at 451. Because the Nonqualified Plan was supplemental to, and dependent on, the Qualified Plan, it terminated automatically on the same date as the Qualified Plan. (JA 084); *In re UAL Corp.*, 468 F.3d at 452.

The Seventh Circuit observed that payment of any amount under the Nonqualified Plan during United's bankruptcy "has been problematic from the outset of the bankruptcy" because, by paying nonqualified retirement payments to pilots who were unsecured creditors, United had improperly preferred one group of unsecured creditors to others. The court observed, "As a debtor in bankruptcy, United had no power to pay one group of unsecured creditors in full while sending most others away with less than 10¢ on the dollar, and the bankruptcy court lacked authority to approve any such preference over protest." *See In re UAL Corp.,* 468 F.3d at 455.

## Termination of Benefits Payments

While the PBGC's request to terminate the Qualified Plan was still pending before the District Court, in September 2005, United

17

ceased paying benefits to participants under the Nonqualified Plan. (JA 083-084.) As a result of the bankruptcy proceedings, United's obligations under the Nonqualified Plan were discharged. Mr. Balestra, as an unsecured general creditor, received shares of stock in the reorganized United with respect to his claim. Considering the payments in cash and stock, Mr. Balestra received only $63,032 of the $289,601 on which FICA tax was applied. No further benefits will ever be paid. (A-003; JA 003.)[10]

## SUMMARY OF THE ARGUMENT

The regulation at issue, Reg. §31.3121(v)(2)-1(c)(2)(ii), requires a determination of the "present value" of deferred compensation without regard to the employer's financial condition, including an employer in bankruptcy. When applied to deferred compensation payable by a bankrupt employer, the regulation is invalid under *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984), as an

---

[10] Mr. Balestra received a $14,195 initial payment, plus 3 months of the $1675.24 benefit in 2004 ($5026), and 9 months in 2005 ($15,077). In his capacity as a general creditor of United with respect to the Nonqualified Plan, Mr. Balestra later received shares of stock in the reorganized United: $27,372 in 2006; $1,288 in 2007; and $74 in 2010. (JA 114.) The complaint claimed a refund of $3,285.26, which was 1.45% of the difference between $289,601 and $63,032. (A-004; JA 004.)

unreasonable interpretation of §3121(v)(2), or is inapplicable under *United States v. Cartwright*, 411 U.S. 546 (1973), because it imposes an unreasonable and unrealistic measure of value without any indication of legislative intent to do so.

The legislative history of §3121(v)(2) demonstrates Congress's intention that the present value of deferred compensation subject to §3121(v)(2) would be determined in accordance with generally applicable valuation rules, "as in many other areas of our tax law."[11]

The rule applicable in determining value in most other areas of the tax law is the willing buyer-willing seller standard. Although mathematical precision is not required in applying this standard, economic reality must be taken into account. Determinations of fair market value based on illogical, unrealistic or unreasonable assumptions, including those supported by regulations similar to the one at issue here, are invalid. The Court of Federal Claims erred in determining that the regulation at issue was a reasonable or permissible interpretation of §3121(v)(2) under either *Chevron* or *Cartwright*.

---

[11] 129 CONG. REC. S6134 (daily ed. Mar. 18, 1983).

The regulation under §3121(v)(2) also violates the Administrative Procedure Act and is arbitrary and capricious under the standard of *Motor Vehicle Mfrs Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), because Treasury did not provide a satisfactory explanation for its departure from the plain meaning of "present value." The Court of Federal Claims erred in determining that a general statement regarding administrability, applicable to the entire regulation, provided the required "rational connection between the facts examined and the action taken." A generalized statement referring to administrability is not a satisfactory explanation under *State Farm*. The Court of Federal Claims also erred in relying on its own, post-hoc rationalization that the regulation could prevent abuse. Treasury articulated no such explanation in adopting the regulation. *State Farm* requires a focus on the agency's statements at the time the regulation was adopted. Post-hoc rationalizations are not permitted. The Court of Federal Claims decision accordingly should be reversed.

# ARGUMENT

## I.   Standard of Review

A grant of summary judgment by the Court of Federal Claims is reviewed without deference. *Dominion Resources, Inc. v. United States*, 681 F.3d 1313, 1317 (Fed. Cir. 2012).

## II.   Background

Sections 3101 and 3111 require employees and employers to pay FICA tax, which is used to support the social welfare programs mandated by the Social Security Act. *See Bubble Room, Inc. v. United States*, 159 F.3d 553 (Fed. Cir. 1998). Only the employee portion of FICA imposed by §3101 is at issue here.

### A.   FICA In General

There are two components of FICA tax: Old Age, Survivors and Disability Insurance (OASDI), which is imposed by §3101(a) at the rate of 6.2% on compensation, with a cap at the "compensation and benefit base;"[12] and Hospital Insurance (HI), which, during the year in issue, was imposed by §3101(b) at the rate of 1.45%, with no cap.[13] Because

---

[12] §3121(a)(1).

[13] Certain increases have been made in the HI portion of the tax post-2004. *See* current §3101(b)(2). These changes are not relevant here.

Mr. Balestra's other wages during the year had already exceeded the compensation and benefit base for 2004 when he retired on October 1 of that year, only the HI portion was due.  (A-004; JA 004.)

The employee portion of FICA is an income tax, imposed on the category of income that constitutes "wages."  *See* §3101(a) & (b) (FICA is imposed on "the income of every individual"); *Helvering v. Davis*, 301 U.S. 619, 634 (1937) (the employee portion of FICA is an income tax); *see also* H.R. REP. NO. 615, 74th Cong., 1st Sess. at 2, 14, 29 (1935); S. REP. NO. 628, at 25, 41 (1935) (same).

Wages for FICA purposes, which are generally considered to be a subset of income,[14] are generally defined under §3121(a), as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash." Under the general rule, FICA tax is imposed on wages at the time they are "received."  §3101(a) & (b); Reg. §31.3101-3; *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200 (2001).  For a cash method taxpayer such as Mr. Balestra, wages would not generally be

---

[14] *See Central Ill. Pub. Serv. Co. v. United States*, 435 U.S. 21, 25 (1978); *Rowan Cos., Inc. v. United States*, 452 U.S. 247, 254 (1981); *Anderson v. United States*, 929 F.2d 648, 654 (Fed. Cir. 1991).

considered "received" until the taxpayer had actually received payment,[15] or had met the requirements of any of the common-law doctrines providing for a taxpayer to be considered in constructive receipt of payment.[16]

B.    Section 3121(v)(2)

Section 3121(v)(2) provides a special definition of "wages" with respect to amounts attributable to nonqualified deferred compensation plans.  Under §3121(v)(2), an amount deferred under a nonqualified deferred compensation plan is taken into account for FICA tax purposes earlier than it would have been under the general rules of section 3121(a) described above.  Section 3121(v)(2) provides:

> (2)  Treatment of certain nonqualified deferred compensation plans

---

[15] *See United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 220 (2001).

[16]  *See Corliss v. Bowers*, 281 U.S. 376, 378 (1930) (unfettered right to receive payment); *Goldsmith v. United States*, 586 F.2d 810, 820 (Ct. Cl. 1978) (an economic benefit that is the equivalent of cash); *Estate of Silverman v. Commissioner*, 98 T.C. 54, 61 (1992) (a cash equivalent promise from a solvent obligor, unconditional, assignable, not subject to setoffs, and of a kind that is frequently transferred to lenders or investors at a discount not substantially greater than the premium for use of money).

(A)  In general.  Any amount deferred under a nonqualified deferred compensation plan shall be taken into account for purposes of this chapter as of the later of—

(i) when the services are performed, or

(ii) when there is no substantial risk of forfeiture of the rights to such amount.

\* \* \*

(B)  Taxed only once.  Any amount taken into account as wages by reason of subparagraph (A) (and the income attributable thereto) shall not thereafter be treated as wages for purposes of this chapter.

There is no dispute in this case that the Nonqualified Plan met the definition of a "nonqualified deferred compensation plan," nor that the appropriate time at which there was "no substantial risk of forfeiture" and the amount was "reasonably ascertainable," *i.e.*, the "resolution date," was on Mr. Balestra's retirement date.  The dispute here focuses on the valuation of the "amount deferred" as of that date.

### 1.    Purpose of §3121(v)(2)

The legislative history makes clear that §3121(v)(2) was intended as a relief provision.[17]  Section 3121(v)(2) was enacted as part of a

---

[17] Because §3121(v)(2) was added as a Senate floor amendment, the legislative history consists of a paragraph in the Conference Report and

larger revision of FICA in 1983. Social Security Amendments of 1983, Pub. L. No. 98-21, 97 Stat. 65, 123 (the 1983 Act). Prior to the 1983 Act, retirement income was generally exempt from FICA tax under the so-called "retirement exception."[18] The 1983 Act repealed the retirement exception and thus subjected post-retirement payments to FICA. 97 Stat. 123.

In 1983, both the OASDI and HI portions of FICA were capped at the compensation and benefit base. Once the cap was met, any additional compensation would be free of FICA tax. After retirement, however, the employee likely would not meet the cap and the full amount of the retirement payments would likely have been subject to FICA each year. In addition, the employee likely would have been receiving Social Security benefits, which could be reduced by the amount of earned income. *See* 129 CONG. REC. S6134. By repealing the retirement exception, Congress subjected retirement pay to FICA and

two floor colloquies. *See* H.R. CONF. REP. NO. 47, 98th Cong., 1st Sess. at 146-47 (1983); 129 CONG. REC. S6134-35 (statements of Sens. Bentsen and Dole).

[18] Sections 3121(a)(2)(A), 3121(a)(3) and 3121(a)(9) (prior to amendment in 1983). The 1983 Act repealed these provisions.

25

also potentially reduced the Social Security benefits payable to retirees. *Id.*

By enacting §3121(v)(2), Congress shifted the time at which nonqualified deferred compensation was taken into account to a preretirement period.  In combination with the cap, this effectively exempted nonqualified deferred compensation payments from FICA, which achieved, through different means, the same result as under the retirement exception.

Section 3121(v)(2) did not, however, provide complete relief from either the OASDI or the HI portion of FICA.  If an employee did not meet the cap at the time the nonqualified deferred compensation was taken into account, as would be the case if the employee's annual compensation did not exceed the cap, or if the employee retired early in the year before the employee's compensation reached the cap, both OASDI and HI would apply.

Senator Bentsen, the sponsor of the floor amendment which ultimately became §3121(v)(2), made clear that the provision was intended to benefit taxpayers by effectively exempting nonqualified deferred compensation payments from FICA—provided the relevant

caps were met—by accelerating the time at which such payments were

taken into account to a time prior to retirement.

> Unfortunately, the Finance Committee [through repeal of the retirement exception] has chosen to subject these nonqualified, deferred amounts to FICA and FUTA taxes when actually paid as retirement payments. . . . .

> My amendment corrects these results by simply subjecting these amounts to FICA and FUTA taxation when the amounts are deferred [pre-retirement], not when they are eventually paid or made available. . . .

> My amendment preserves social security benefits for retired persons by simply making amounts deferred under nonqualified compensation plans subject to FICA and FUTA when deferred, not when eventually paid or made available.

> There is negligible revenue loss, if any, and the amendment should be adopted.

> Mr. President, what we are dealing here with is an amendment that deals with deferred compensation and under the present law, this is one where you would not have a tax incurred [because of the retirement exception]. What I am asking for and what has been checked with the chairman of the committee and with Senator Long, the ranking minority member, is a piece of legislation that is revenue neutral . . . .

129 CONG. REC. S6134. The reference in the legislative history to "when

amounts are deferred" is clear with respect to account balance plans,

27

where an employee's nominal account balance is periodically increased during his or her working lifetime.  For nonaccount balance plans, the question of "when amounts are deferred" is somewhat more abstract.  Many cases are similar to the instant case, where amounts are considered to be "deferred" only when there is no longer any substantial risk of forfeiture and the amount is reasonably ascertainable, typically at retirement.

As shown from the quoted portion of the debate, Congress's focus in enacting section 3121(v)(2) was on changing the time at which nonqualified deferred compensation would be taken into account for FICA purposes, rather than changing the nature of what was being taxed.  This focus on timing was echoed in the Conference Report:

> With respect to nonqualified deferred compensation plans, the conference agreement generally follows the Senate amendment that includes amounts deferred in the employee's FICA and FUTA wage base when services are performed or, if later, when there is a lapse of a substantial risk of forfeiture (within the meaning of sec. 83) of the employee's right to those amounts.

H.R. CONF. REP. NO. 47, 98th Cong., 1st Sess. at 147 (1983).  As noted, with respect to a nonaccount balance plan such as the one at issue here,

amounts deferred would be included in the employee's FICA wage base, not when the services were performed, but at the time of retirement, when there was no longer any substantial risk of forfeiture and the right to deferred compensation had become reasonably ascertainable.

> 2.    <u>Congress Indicated That the Amount Deferred for a Nonaccount Balance Plan Should Be the Present Value "As In Many Other Areas of Our Tax Law"</u>

While Congress's intent with respect to the timing of inclusion of nonqualified deferred compensation in FICA income is clear from both the statute and the legislative history, the statute is silent with respect to how the "amount deferred" should be computed, *i.e.*, what amount would be included in FICA income as of the relevant time. The legislative history, however, addresses this question.

For account balance plans, where the employee's nominal account balance is periodically credited with additional amounts, the legislative history states that "it is a relatively simple matter to determine when amounts are being deferred and the amount that is being deferred." 129 CONG. REC. S6134. Accordingly, for account balance plans, the "amount deferred" is the amount periodically added to the employee's nominal account balance.

For nonaccount balance plans such as the one at issue here, Congress specified that the amount to be included in FICA income should be the present value, determined by simple rules "as in many other areas of our tax law." The legislative history states as follows:

> In most cases, under nonqualified deferred compensation agreements it is a relatively simple matter to determine when amounts are being deferred and the amount that is being deferred. Likewise, as in many other areas of our tax law, simple rules can be established to determine the present value of amounts deferred in other cases.

129 CONG. REC. S6134. The legislative history is clear that Congress's intention in enacting section 3121(v)(2) was to accelerate the recognition of nonqualified deferred compensation, and thereby largely exempt such compensation from FICA taxation and avoid the impact of the repeal of the retirement exception. There is no indication, however, that Congress intended to dramatically alter the amount subject to tax.

In 1993, Congress repealed the cap on the HI portion of FICA for 1994 and thereafter.[19] This had the effect of subjecting all nonqualified deferred compensation includible under §3121(v)(2) to FICA tax at the

---

[19] Omnibus Budget Reconciliation Act of 1993, Pub. L. No. 103-66, 107 Stat. 312, §§13207(a) and (b).

HI rate.  Nonqualified deferred compensation continues also to be subject to the OASDI portion of FICA to the extent the employee has not met the cap at the time of retirement.

C.    The Regulations

No Treasury or IRS guidance was provided with respect to section 3121(v)(2) from its enactment in 1983 until after the repeal of the HI cap in 1993.  In 1994, the IRS issued Notice 94-96, 1994-2 C.B. 564, which informed taxpayers that until final regulations were issued, the IRS would not challenge an employer's determination of FICA tax liability with respect to a nonqualified deferred compensation plan for periods before the effective date of any final regulations if the determination was based on "a reasonable, good faith interpretation" of §3121(v)(2).

After a notice of proposed rulemaking issued in 1996,[20] the §3121(v)(2) regulations were finalized in 1999.[21]  The regulations provide rules for calculating the "amount deferred" to be included in FICA income with respect to nonqualified deferred compensation plans.

[20] 61 Fed. Reg. 2194 (Jan. 25, 1996).

[21] 64 Fed. Reg. 4542, T.D. 8814, 1999-1 C.B. 601 (Jan. 29, 1999).

31

For nonaccount balance plans such as the plan at issue in this case, the regulations require inclusion of "the present value of the additional future payment or payments to which the employee has obtained a legally binding right (as described in paragraph (b)(3)(i) of this section) under the plan during that period." Reg. §31.3121(v)(2)-1(c)(2)(i). For a nonaccount balance plan such as the one at issue here, the employee generally would not be taxed until the "resolution date," which in this case would be the employee's retirement date.[22]

The regulations provide that "present value" means "the value as of a specified date of an amount or series of amounts due thereafter, where each amount is multiplied by the probability that the condition or conditions on which payment of the amount is contingent will be satisfied, and is discounted according to an assumed rate of interest to reflect the time value of money." Reg. §31.3121(v)(2)-1(c)(2)(ii). The regulations require that the determination of present value be made "using actuarial assumptions and methods that are reasonable" as of

_____

[22] There is no dispute that Mr. Balestra's rights under the Nonqualified Plan were legally binding within the meaning of Reg. §31.3121(v)(2)-1(b)(3)(ii) as of the date of his retirement, October 1, 2004, nor that his legal rights were terminated shortly thereafter, when the plan terminated as of December 30, 2004.

the date the amount deferred is required to be taken into account (here,

on the retirement date).  *Id.*  A discount is allowed for the probability

that the employee will die before commencement of benefit payments,

but only to the extent that payments will be forfeited upon death.  No

discount is allowed to reflect the bankruptcy or insolvency of the

employer at the time of retirement:

> [T]he present value cannot be discounted for the
> probability that payments will not be made (or
> will be reduced) because of the unfunded status
> of the plan, the risk associated with any deemed
> or actual investment of amounts deferred under
> the plan, the risk that the employer, the trustee
> or another party will be unwilling or unable to
> pay, the possibility of future plan amendments,
> the possibility of a future change in the law, or
> similar risks or contingencies.

*Id.*  It is worth noting that this valuation provision appeared for the

first time in the §3121(v)(2) regulations.  No similar provision is found

in any earlier provision of the Code or regulations.  In 2008, Treasury

proposed an income tax regulation containing identical language, but

with the important difference that a deduction is available to the extent

the employee's rights to receive deferred compensation are later

forfeited.[23]  Reg. §31.3121(v)(2)-1(c)(2)(ii) is the provision that Mr.

Balestra contends is arbitrary and capricious as applied in valuing his

right to receive nonqualified deferred compensation from an employer

in bankruptcy.  This regulation is not a reasonable interpretation of

§3121(v)(2), because it departs without explanation from the standard

generally applicable in determining value throughout the Internal

Revenue Code.

    D.    <u>Generally Applicable Tax Rules Regarding Valuation</u>

The tax code generally adopts a "willing buyer-willing seller"

standard for determining value.  This standard is set forth in the

regulations with respect to particular areas of the tax law, but its use is

not limited to specific situations; it is applied more generally.  *See* Reg.

§1.170A–1(c)(2) (charitable contributions); Reg. §20.2031–2(f) (estate

tax); Reg. § 25.2512–2(f) (gift tax); *American Home Prods. Corp. v.*

*United States*, 601 F.2d 540, 544-45 (Ct. Cl. 1979) (willing buyer-willing

seller is a general measure of fair market value in other areas of the tax

---

[23] *See* Prop. Reg. §1.409A-4(b)(2), 73 Fed. Reg. 74380, 74395, (Dec. 8, 2008) (valuation language substantially identical to §31.3121(v)(2)-1(c)(2)(ii)); Prop. Reg. §1.409A-4(g)(1), 73 Fed. Reg.  at 74403 (providing for a deduction if the right to receive payments is terminated).

code, citing cases). Under the willing buyer-willing seller standard, value is defined as the price at which the property would change hands between a willing buyer and a willing seller, where neither is under any compulsion and where both have reasonable knowledge of all relevant facts. *See* Reg. §1.170A–1(c)(2). As applied to the facts at issue here, assuming it would have been legally possible for Mr. Balestra to transfer his right to receive nonqualified deferred compensation from United on his retirement date, the question is, would a buyer have paid $289,601 to step into Mr. Balestra's shoes? Clearly not, given that the $289,601 was determined without taking into account Mr. Balestra's status as an unsecured general creditor in United's bankruptcy and United's earlier prediction that its plans would be terminated.

The willing buyer-willing seller standard is consistent with the general principle that income taxes, such as the employee portion of FICA, should be imposed only to the extent a taxpayer has realized an increase in wealth. *See United States v. Hudson*, 299 U.S. 498, 500 (1937) (the distinguishing characteristic of an income tax is that "a profit is made the occasion for the tax and also the measure of it."). Although Congress can specify what it means by "income," the term is

traditionally understood to involve an "accession[] to wealth, clearly realized, and over which the taxpayers have complete dominion." *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426, 431 (1955); *cf. Murphy v. Internal Revenue Service*, 493 F.3d 170, 179 (D.C. Cir. 2007). Use of a valuation standard that reflects economic reality is therefore consistent with the characterization of the employee portion of FICA as an income tax.

The concept of value as used in commercial law also takes into account the risk that the stream of payments will not be made because of the financial condition of the obligor. For example, this Court's predecessor has interpreted the term "present value" as taking account of all risks that would be involved in converting a property right into cash. *See Estate of Ridgely v. United States*, 180 Ct. Cl. 1220 (1967) (present value of a parcel of real estate must be discounted by one-half to account for the risk that it would not be purchased for industrial development); *Navajo Tribe of Indians v. United States*, 364 F.2d 320, 344 (Ct. Cl. 1966) (present value of a helium reserve must be discounted by one-half to account for the risk that the entire estimated reserve could not be recovered). This Court has also held that a discount rate

36

used in calculating the present value of a future income stream must take into account both the time value of money and the risks involved. *See Energy Capital Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir. 2002).

### III.   The Regulation is Invalid or Inapplicable To Deferred Compensation From a Bankrupt Employer.

The validity of Treasury regulations is determined under the standards of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See Mayo Foundation for Medical Educ. & Res. v. United States*, 562 U.S. 44 (2011). Under this standard, a regulation may be invalidated if it is arbitrary and capricious in substance or manifestly contrary to the statute. *Id.*; *see also Dominion*, 681 F.3d at 1317.

Under the first step of the *Chevron* analysis, a court must determine "whether Congress has directly spoken to the precise question at issue." *Chevron,* 467 U.S. at 842. If the intent of Congress is clear, that is the end of the analysis; courts and agencies must give effect to Congress's intent. *Id.* at 843. Because §3121(v)(2) does not directly address the calculation of the "amount deferred," *Chevron* step one is not at issue here. (*See* A-010; JA 010.)

37

If Congress has not spoken to the question at issue, *Chevron* step two analysis requires a determination whether the agency's interpretation is based on a reasonable or permissible construction of the statute. 467 U.S. at 843, 844. The history and purpose of the statute can be considered in determining whether the regulation is a permissible interpretation. *See, e.g., Babbitt v. Sweet Home Chapter of Cmtys. for a Greater Oregon*, 515 U.S. 687, 697-704 (1995); *Rust v. Sullivan,* 500 U.S. 173, 184-85, 188-90 (1991); *Dominion*, 681 F.3d at 1317-19.

A.  <u>The Regulation Conflicts With The Purpose and History of Section 3121(v)(2), Which Indicate that Present Value Should be Determined in the Same Way as in Other Provisions of the Code.</u>

This Court's decision in *Dominion* illustrates the *Chevron* step two analysis that is to be applied to Treasury regulations. In *Dominion*, the taxpayer incurred expenses in making improvements to coal burners, which were temporarily withdrawn from service while the improvements were made. To determine the amount of interest required to be capitalized for inventory purposes under §263A(f), the regulation at issue required the adjusted basis of the entire unit temporarily withdrawn from service (*i.e.*, its depreciated cost) to be

38

included in "production expenditures," which were then multiplied by a weighted-average interest rate to determine capitalized interest. 681 F.3d at 1316. The Court held that the purpose of §263A(f), derived from the text and the legislative history, was to adopt an avoided-cost principle, under which interest would be capitalized only if, had the improvement not been made, the funds could have been used to pay down debt and therefore reduce interest accrued on the debt. *Id.* at 1317-18.

When the regulation was considered in light of the purpose and legislative history of the statute, it was clear that the requirement to capitalize interest based on the entire cost of the unit "makes no sense," because there was no way that a taxpayer could have avoided accruing interest on the cost of the entire unit by not making the improvement. *Id.* at 1318. Interest could have been avoided on the adjusted basis of the entire unit only if it were assumed that the taxpayer would sell the unit rather than make the improvement, an assumption that the Court characterized as "removed from reality" because "there was no reasonable explanation that assumes that a property owner would have sold the same unit that it removed from service for the sole purpose of

improving." *Id.* The regulation therefore contradicted the avoided-cost rule and was not a reasonable interpretation of the statute. *Id.*

In the instant case, the trial court distinguished *Dominion* on the ground that the statute in that case prescribed a rule with which the regulation was inconsistent, where in this case, the statute was silent. (A-010; JA 010.) This is not a valid distinction; *Dominion* makes clear that the statute there was silent on the question at issue, as well as being generally "circular" and "opaque." *Id.* at 1315, 1317. It was only with the assistance of legislative history and consideration of the purpose of the statute that the Court was able to determine that the regulation was an unreasonable interpretation. *See id.* at 1318. Indeed, in all *Chevron* step two analysis, the statute is silent as to the question at issue. If the statute had addressed the question, the proper analysis would be under *Chevron* step one. *See Chevron*, 467 U.S. at 842.

When the legislative history and purpose of §3121(v)(2) are considered, it is clear that Congress's intent was to impose FICA tax on the present value of a stream of future payments, as "present value" was used in its plain and ordinary sense in other parts of the tax code.

40

The legislative history states that present value should be determined by "simple rules" as used in "many other areas of our tax law."[24]  As discussed above, the generally applicable rules for determining fair market value and present value are geared to determining an economically reasonable value.

The regulation here may well be a reasonable interpretation of the statute when applied to employers not in bankruptcy.  However, as applied to a bankrupt employer, the regulation is plainly inconsistent with the willing buyer-willing seller standard and with economic reality.  As applied to a bankrupt employer, the regulation makes no sense from an economic perspective, like the regulation at issue in *Dominion*.  *See* 681 F.3d at 1318.  And, like the regulation at issue in *Dominion*, the regulation here makes an illogical and unreasonable assumption—that employers in bankruptcy will be able to pay future benefits and will not take advantage of their ability under the Bankruptcy Code to avoid their obligations to unsecured general creditors.  Like the regulation in *Dominion*, Reg. §31.3121(v)(2)-

---

[24] 129 CONG. REC. S6134.  *See* page 30, *supra*.

1(c)(2)(ii) is an unreasonable and impermissible interpretation of the

statute, and is therefore invalid under *Chevron* step two.

B.    Regulations May Not Impose an Unreasonable and
      Unrealistic Measure of Value Unless Supported by a Clear
      Expression of Legislative Intent

The trial court's holding was that, because the text of the statute

was silent regarding the computation of the "amount deferred" to be

included in income for FICA purposes, any method of determining the

value of that amount was a reasonable interpretation of the statute, so

long as it took into account some adjustment to the nominal payment

stream to reflect the deferred nature of the payments. (A-012; JA 012.)

The court stated that, if there were an "off-the-rack" rule regarding

present value, from which Treasury had deviated without explanation,

an argument that the regulations were an impermissible interpretation

of the statute "would have more force." (*Id.*)

As is discussed below, the trial court was presented with

numerous authorities discussing the "off the rack" plain meaning of fair

market value as used in the tax code, as well as in commercial contexts.

The court erroneously chose to disregard these authorities, including

the Supreme Court's decision in *Cartwright*, all of which hold that,

where Congress has not specifically indicated that a noneconomic

concept of value be used, regulations determining value for tax purposes

must conform to the general willing buyer-willing seller standard

applicable generally in the tax code.  Regulations that deviate from the

willing buyer-willing seller standard without statutory support and

produce an economically unreasonable valuation are invalid as applied.

    1.    <u>The Supreme Court in *Cartwright* Invalidated a Regulation That Conflicted with the General Definition of Fair Market Value.</u>

The principle that regulations may not validly adopt a definition

of value that is at odds with the general willing buyer-willing seller

standard was articulated in *United States v. Cartwright*, 411 U.S. 546

(1973).  The issue in *Cartwright* was the validity of an estate tax

regulation, which, as applied to shares in a "load" mutual fund, resulted

in a value that varied significantly from the general willing buyer-

willing seller standard.[25]  The regulation required that mutual fund

shares be valued for estate tax purposes at the price at which they were

---

[25] A "load" mutual fund requires purchasers of mutual fund shares to pay a sales charge in addition to the "net asset value" of the shares; a "no-load" mutual fund does not impose a sales charge.  *See* 411 U.S. at 551.

sold to the public by the fund, which, in the case of a "load" fund, would include a sales charge.  There was no trading market for the mutual fund shares; the taxpayer could dispose of them only through redemption by the mutual fund at a price which reflected their net asset value, but not the sales charge.  *Id.* at 551.

The Court in *Cartwright* observed that "[t]he willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate and gifts taxes themselves . . . ."  *Id.*  As applied to the mutual fund shares, the regulatory valuation rule produced an "unreasonable and unrealistic" result that was significantly at odds with the willing buyer-willing seller standard, by presuming that the price that could be received by the taxpayer in a willing buyer-willing seller transaction would include the sales charge, when the only opportunity available to the taxpayer to transfer the shares was at a price that did not include the sales charge.  The Court invalidated the regulations as applied— "it does not follow that, because [the Commissioner] has a choice of alternatives, his choice should be sustained where the alternative chosen is unrealistic.  In such a situation, the regulations embodying that choice should be held to be unreasonable."  411 U.S. at 557

44

(quoting *Estate of Wells v. Commissioner*, 50 T.C. 871 (1968)

(Tannenwald, J., dissenting), *aff'd sub nom Ruehlmann v.*

*Commissioner*, 418 F.2d 1302 (6th Cir. 1969)).

The decision in *Cartwright* is consistent with the results in cases

decided both before and after *Cartwright*, holding that if the result

produced by applying annuity tables to determine fair market value is

unrealistic and unreasonable, some modification must be made to the

method prescribed by the tables, or some other "facts-and-

circumstances" approach must be used to determine value.  For

example, the Eighth Circuit held that an annuity table incorporating a

10 percent annual rate of return could not properly be applied to value

stock which had historically generated only a 0.2 percent rate of return.

The court stated, "whenever use of the tables would produce a

substantially unrealistic and unreasonable result, and a more

reasonable and realistic means of determining value is available, the

statute requires, and decades of case law confirm, that the tables may

not be used by either the Commissioner or the taxpayer."  The court

stated that use of the regulation to value the property at issue "might

well invalidate the regulation."  *O'Reilly v. Commissioner*, 973 F.2d

1403, 1407-08 (8th Cir. 1992); *see also Huntington Nat. Bank v. Commissioner*, 13 T.C. 760, 772 (1949) (holding that it was improper to use a mortality table to value the life estate of an elderly widow in poor health); *Hanley v. United States*, 63 F. Supp. 73, 80-82 (Ct. Cl. 1945) (holding that, under the regulations, the use of a 4 percent rate of return was improper where its use "produces a result substantially at variance with the facts"); *cf. Green v. Commissioner*, 22 T.C. 728, 732–33 (1954) (holding that a table with a 4 percent rate of return was properly applicable to property with a yield of 4.34 percent, noting that a yield of 10 percent would have been a sufficient reason for departing from the table).

The holding of *Cartwright* is not limited to the use of the term "fair market value," but has been applied to other terms defined in a regulation in a manner than conflicts with the plain meaning of the term. *See State of Wash. v. Commissioner*, 77 T.C. 656, 676 (1981), *aff'd*, 692 F.2d 128 (D.C. Cir. 1982) (applying the principles of *Cartwright* to the definition of "yield").

The lesson of *Cartwright* is that, absent a statutory direction to employ another measure of fair market value, regulations incorporating

46

a valuation method must, as applied, produce a realistic value that does not vary significantly from the willing buyer-willing seller standard.  In the absence of a statutory direction, regulations which conflict with this standard are invalid.  *Cartwright*, 411 U.S. at 557; *cf. Gudmundsson v. United States*, 634 F.3d 212 (2d Cir. 2011).

     2.    <u>The Fifth and Tenth Circuits in *McDonald* and *Gresham* Invalidated a Regulation Similar To Reg. §31.3121(v)(2)-1(c)(2)(ii) Because It Conflicted With the General Meaning of Fair Market Value.</u>

In cases involving a valuation regulation similar to Reg. §31.3121(v)(2)-1(c)(2)(ii), the Fifth Circuit and the Tenth Circuit both invalidated the regulation because it was an unreasonable interpretation of the statutory direction to employ "fair market value" as the measure of tax.  *See McDonald v. Commissioner*, 764 F.2d 322, 329 (5th Cir. 1985); *Estate of Gresham v. Commissioner*, 752 F.2d 518, 523 (10th Cir. 1985).[26]

The statutory provision at issue in *McDonald* and *Gresham* was §57(a)(6), which subjected certain qualified stock options to the

---

[26] The Eastern District of Missouri also reached the same conclusion. *Steinberg v. United States*, 606 F. Supp. 228 (E.D. Mo. 1985).  The government did not appeal.

alternative minimum tax (AMT).  The statute defined the amount

subject to AMT as "[t]he amount by which the fair market value of the

share at the time of exercise exceeds the option price."  The regulations

incorporated the definition of fair market value under a different code

section, §83, which applies to property transferred in exchange for the

performance of services.  Reg. §1.57-1(f)(3).  The §83 definition of fair

market value provided that the value of the property should be

determined "without regard to any restriction other than a restriction

which by its terms will never lapse."  §83(a)(1).

The stock at issue in *McDonald* and *Gresham* was so-called

"lettered" stock, subject to restrictions contained in an investment

letter, which prohibited any transfers of the stock for a period of two

years, except in a private placement in which the buyer would be

required to execute a similar investment letter.[27]  The taxpayers were

---

[27] *McDonald*, 764 F.2d at 323; *Gresham*, 752 F.2d at 519.  Both courts
distinguished "lettered" stock from stock subject to restrictions under
§16(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78p(b), which
did not prohibit sales of stock on the open market, but merely required
disgorgement of any short-swing profit thereby obtained.  Courts have
held that the §57 regulations were not invalid as applied to stock
subject to §16(b) restrictions.  *Harrison v. United States*, 475 F. Supp.
408 (E.D. Pa. 1979), *aff'd without published opinion*, 620 F.2d 288 (3d
Cir. 1980); *Kolom v. Commissioner*, 71 T.C. 235 (1978), *aff'd*, 644 F.2d

taxable for AMT purposes when they received the stock. At that time, the taxpayers' only available option to sell the stock was in a private placement, at a price that would have been significantly below the public trading price of the stock.[28] The regulations disregarded the 2-year prohibition on sales of the stock in the market, and instead required use of the trading value of the stock. Both the Fifth Circuit and the Tenth Circuit held that the regulation was invalid, because it adopted a rule that contravened the ordinary usage of the term "fair market value." By requiring temporary restrictions to be disregarded, the regulations produced a value which was substantially in excess of the willing buyer-willing seller value. This inflated value was, in the *McDonald* court's view, not "fair market value," but instead something other than fair market value.[29] Treasury's decision to adopt a regulation providing for something other than fair market value was thus an unreasonable interpretation of the statute, which specified that the amount subject to tax would be measured by fair market value.

1282 (9th Cir. 1981). *See McDonald*, 764 F.2d at 337-38; *Gresham*, 752 F.2d at 521.

[28] *McDonald*, 764 F.2d at 323; *Gresham*, 752 F.2d at 519.

[29] *McDonald*, 764 F.2d at 330-31; *see also Gresham*, 752 F.2d at 521.

The court in *McDonald* expressly recognized that valid regulations could make certain simplifying assumptions in determining fair market value. Practical considerations could dictate that some theoretically relevant factors could be disregarded or assigned an arbitrary weight in order to reduce the cost or difficulty of making particular valuations. The need for accuracy could also vary with the use to be made of the resulting value. The court recognized that "[c]ertainly, there is room for regulatory discretion for such purposes." Treasury's ability to adopt regulations, however, was limited by the traditional concept of fair market value articulated in *Cartwright*. 764 F.2d at 330.

As in *McDonald* and *Gresham*, there is no clear Congressional expression of intent in §3121(v)(2) to use a value other than the general willing buyer-willing seller value. Rather, Congress indicated its intention that present value for §3121(v)(2) purposes should be determined under the same rules used in many other areas of tax law.

Instead of following the Congressional direction to use the general valuation rule, Treasury chose instead to adopt a rule which consistently disregarded an important element of value, namely, whether the obligor was presently financially able to pay the promised

50

benefits in the future. In the case of a bankrupt employer, the regulation ignores the economic realities of the risks associated with the employer's being currently insolvent, under bankruptcy protection, and seeking to avoid the very obligation that is the subject of the tax. Essentially, the regulations simply assume that a bankrupt employer will fully satisfy its *future* liabilities despite the fact that it is unable to satisfy even its *current* liabilities. Here, it was entirely predictable as of October 2004 that United's nonqualified retirement liabilities would be paid, if at all, at cents on the dollar. As the Seventh Circuit observed, payment of benefits under the Nonqualified Plan "has been problematic from the outset of the bankruptcy" because the pilots, as unsecured creditors, could not be paid in full while other unsecured creditors received only a small fraction of their claims. *See In re UAL Corp.*, 468 F.3d at 455.

Treasury's decision to adopt regulations that result in a substantial variation from the willing buyer-willing seller standard conflicts with both the intention of Congress in adopting §3121(v)(2) and with *Cartwright.* As applied to a bankrupt employer, this measure of value fails to reflect economic reality and does not implement the

51

statute in a reasonable manner.  Reg. §31.3121(v)(2)-1(c)(2)(ii) is

therefore invalid as applied to the nonqualified deferred compensation

in this case.

## IV.    The Regulation is Arbitrary and Capricious Because Treasury Did Not Provide a Satisfactory Explanation for Its Departure from the Plain Meaning of the Term "Present Value."

Under the Administrative Procedure Act, a court reviewing an

agency action shall "hold unlawful and set aside" the action if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law."  5 U.S.C. §706(2)(A).  In *State Farm*, the Supreme

Court held that, to satisfy the APA, the agency must "examine the

relevant data and articulate a satisfactory explanation for its action,

including a rational connection between the facts found and the choice

made."  463 U.S. at 43 (quoting *Burlington Truck Lines v. United

States*, 371 U.S. 156, 168 (1962)).  A regulation is arbitrary and

capricious if, in adopting the regulation, "the agency . . . entirely failed

to consider an important aspect of the problem."  463 U.S. at 43.  The

same principle existed under pre-APA common law: "The grounds upon

which an administrative order must be judged are those upon which the

record discloses that its action was based." *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943).

The requirement of a reasoned explanation for agency action is fully consistent with *Chevron*, in which the Supreme Court made clear that an important reason why the regulation was entitled to deference was because "the agency considered the matter in a detailed and reasoned fashion." 467 U.S. at 865. The requirements of *State Farm* are therefore closely related to the *Chevron* step two analysis, and may often overlap. *See Judulang v. Holder*, 132 S. Ct. 476, 484 n.7 (2011); *see also National Org. of Veterans' Advocates, Inc. v. Secretary of Veterans Affairs,* 669 F.3d 1340, 1347-48 (Fed. Cir. 2012).

This Court held the regulation at issue in *Dominion* violated the *State Farm* standard because Treasury provided no "satisfactory or cogent explanation" for its choice to include the adjusted basis of the entire unit in the avoided-cost calculation. 681 F.3d at 1319. Specifically, the regulation failed to provide any explanation for the way that the use of adjusted basis in the computation implemented the statutory avoided-cost rule. *Id.*

A.    <u>General Statements Regarding Administrative Convenience Are Not a Sufficient Explanation</u>

In determining that the §3121(v)(2) regulations were a reasonable interpretation of the statute, and that the explanation provided for them was sufficient under *State Farm*, the Court of Federal Claims considered what it characterized as "the clear, contemporaneous explanation of the rationale for this valuation method." (A-012; JA 012.) The court noted that the Treasury had recognized that applying §3121(v)(2) "often requires difficult valuations of future benefits" and explained that, "Recognizing the practical administrative problems that can be encountered by taxpayers in this area, the proposed regulations are designed to be workable, to minimize complexity, and to provide appropriate flexibility for taxpayers." (A-011; JA 011, citing 61 Fed. Reg. 2194, 2195 (Jan. 25, 1996.)) This one sentence sums up the Treasury's approach with respect to the entire proposed regulation, which consumes some 20 pages in the Federal Register.

The sentence chosen by the trial court as the "cogent explanation" for the valuation choice does not even refer to the valuation method. Instead, it makes a general assertion with respect to the regulation as a whole. There is no explanation of the rational connection between the

facts found with respect to nonqualified plans and the choice to disregard, in determining value, the possibility that benefits would never be paid.  Nor is there any explanation of how disregarding the bankruptcy of the employer would provide "appropriate flexibility for taxpayers."  This sentence is merely a generalized statement of the approach taken in formulating the entire regulation. This generalized statement does not meet the requirements of *State Farm*.  As the Supreme Court has stated in another context, "The natural meaning of words cannot be displaced by reference to difficulties in administration. For the ultimate question is what has Congress commanded, when it has given no clue as to its intentions except familiar English words and no hint by the draftsmen of the words that they meant to use them in any but an ordinary sense." *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 617-18 (1944) (internal citation omitted); *see also State Farm*, 455 U.S. at 55 (agency's failure to analyze an alternative failed to "offer the rational connection between facts and judgment.")

Although the trial court did not mention it, the Preamble to the final regulations does refer to an employer's financial condition with respect to account balance plans.  In an account balance plan, a

taxpayer's nominal account balance is typically credited with a nominal rate of return. *See* Treas. Reg. §31.3121(v)(2)-1(c)(1)(ii)(A). Commentators on the proposed regulations had suggested that the employer's financial condition should be permitted to be considered in determining whether the interest rate credited under the account balance plan was reasonable.[30]  Treasury rejected that suggestion, stating as follows:

> Some commentators suggested that the employer's creditworthiness should be permitted to be considered in determining whether the interest rate credited under a plan of the employer is reasonable. The final regulations, like the proposed regulations, permit the amount deferred to be calculated after application of a discount to reflect the time value of money and the risk that benefits will not be paid due to death.  However, no discount is permitted for the risk that the amount deferred will not be paid by the employer.  Permitting employers to implicitly achieve the same result through the interest rate credited under an account balance plan would be inconsistent with this restriction.  Accordingly, the final regulations do not permit the employer's

---

[30] Comments submitted by Atlantic Richfield Company urged Treasury to allow interest rates for account balance plans to exceed the AFR, because "plan participants are essentially unsecured creditors of the company and have the same credit rights as general lenders in the event of bankruptcy." *See ARCO Suggests Changes to Deferred Compensation FICA Regs*, 96 Tax Notes Today 140-28 (June 20, 1996).

> creditworthiness to be considered in determining
> whether the interest rate credited under a plan of
> the employer is reasonable.

64 Fed. Reg. at 4544-45 (emphasis added).  Although this statement

confirms that Treasury deliberately chose to disregard the employer's

financial condition in the case of an account balance plan, like the

general assertion of administrability relied on by the trial court, it fails

to reflect "any rational connection between facts and judgment" as

required under *State Farm.*  This Court held in *Dominion* that

mentioning a decision made by Treasury without any explanation of the

rationale for the decision is not a satisfactory explanation under *State

Farm.*  681 F.3d at 1319.

B.    <u>Post-Hoc Rationalizations Are Not a Sufficient Explanation</u>

The trial court stated that Treasury's adoption of the regulation

could also have been motivated by Treasury's desire to avoid

"complicated and strategic-behavior-enabling use of risk-adjusted

discount rates." (A-012; JA 012.)  Treasury did not include this

rationale in either of the Preambles to the proposed or final regulations.

This post-hoc rationalization also does not meet the requirements of

*State Farm.*  Agency action may be upheld only "on the basis

articulated by the agency itself." 463 U.S. at 50 (internal citations omitted). Treasury did not indicate a concern in the Preamble about abuse of the valuation method. It only stated that there should be no discount for the risk of non-payment. *See* 64 Fed. Reg. at 4544-45. The trial court's speculation about Treasury's concern about abuse is therefore not a sufficient explanation under *State Farm*.

* * *

The general willing buyer-willing seller standard is broadly applicable across the Internal Revenue Code. Without any explanation of its reasons, Treasury chose to make a substantial departure from this standard in the case of a bankrupt employer. Therefore, as so applied, Reg. §31.3121-1(c)(2)(ii) is invalid under Chevron step two, *Cartwright* and *State Farm*.

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Federal

Claims should be reversed.

/s/ Mary E. Monahan
Mary E. Monahan
Adam B. Cohen
Rich Sun
SUTHERLAND ASBILL & BRENNAN LLP
700 Sixth Street, NW, Suite 700
Washington, DC  20001-3980
Tel: (202) 383-0100
Fax: (202) 637-3593

*Counsel for Plaintiffs-Appellants*

October 14, 2014

# STATUTORY ADDENDUM

**26 U.S.C. §3101**

**(a) Old-age, survivors, and disability insurance.**--In addition to other taxes, there is hereby imposed on the income of every individual a tax equal to the following percentages of the wages (as defined in section 3121(a)) received by him with respect to employment (as defined in section 3121(b))--

| In cases of wages received during: | The rate shall be: |
| --- | --- |
| 1984, 1985, 1986, or 1987 | 7 percent |
| 1988 or 1989 | 6.06 percent |
| 1990 or thereafter | 6.2 percent. |

**(b) Hospital insurance.**--In addition to the tax imposed by the preceding subsection, there is hereby imposed on the income of every individual a tax equal to the following percentages of the wages (as defined in section 3121(a)) received by him with respect to employment (as defined in section 3121(b))--

**(1)** with respect to wages received during the calendar years 1974 through 1977, the rate shall be 0.90 percent;

**(2)** with respect to wages received during the calendar year 1978, the rate shall be 1.00 percent;

**(3)** with respect to wages received during the calendar years 1979 and 1980, the rate shall be 1.05 percent;

**(4)** with respect to wages received during the calendar years 1981 through 1984, the rate shall be 1.30 percent;

**(5)** with respect to wages received during the calendar year 1985, the rate shall be 1.35 percent; and

**(6)** with respect to wages received after December 31, 1985, the rate shall be 1.45 percent.

\*   \*   \*

## 26 U.S.C. §3121(v)(2)

**(2) Treatment of certain nonqualified deferred compensation plans.--**

    **(A) In general.--**Any amount deferred under a nonqualified deferred compensation plan shall be taken into account for purposes of this chapter as of the later of--

        **(i)** when the services are performed, or

        **(ii)** when there is no substantial risk of forfeiture of the rights to such amount.

        The preceding sentence shall not apply to any excess parachute payment (as defined in section 280G(b)).

    **(B) Taxed only once.--**Any amount taken into account as wages by reason of subparagraph (A) (and the income attributable thereto) shall not thereafter be treated as wages for purposes of this chapter.

    **(C) Nonqualified deferred compensation plan.--**For purposes of this paragraph, the term "nonqualified deferred compensation plan" means any plan or other arrangement for deferral of compensation other than a plan described in subsection (a)(5).

**Treasury Regulation § 31.3121(v)(2)-1  Treatment of amounts deferred under certain nonqualified deferred compensation plans.**

\*   \*   \*

(c)  Determination of the amount deferred.—

\*   \*   \*

(2)  Nonaccount balance plans.—(i).  General rule.— For purposes of this section, if benefits for an employee are provided under a nonqualified deferred compensation plan that is not an account balance plan (a nonaccount balance plan), the amount deferred for a period equals the present value of the additional future payment or payments to which the employee has obtained a legally binding right (as described in paragraph (b)(3)(i) of this section) under the plan during that period.

(ii) Present value defined.—For purposes of this section, present value means the value as of a specified date of an amount or series of amounts due thereafter, where each amount is multiplied by the probability that the condition or conditions on which payment of the amount is contingent will be satisfied, and is discounted according to an assumed rate of interest to reflect the time value of money. For purposes of this section, the present value must be determined as of the date the amount deferred is required to be taken into account as wages under paragraph (e) of this section using actuarial assumptions and methods that are reasonable as of that date. For this purpose, a discount for the probability that an employee will die before commencement of benefit payments is permitted, but only to the extent that benefits will be forfeited upon death. In addition, the present value cannot be discounted for the probability that payments will not be made (or will be reduced) because of the unfunded status of the plan, the risk associated with any deemed or actual investment of amounts deferred under the plan, the risk that the employer, the trustee, or another party will be unwilling or unable to pay, the possibility of future plan amendments, the possibility of a future change in the law, or similar risks or contingencies. Nor is the present value affected by the possibility that some of the payments due under the plan will be eligible for one of the exclusions from wages in section 3121(a).

*    *    *

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on this 14th day of October, 2014.  I further certify that service of the brief was made on counsel for the appellant by CM/ECF.

/s/ Mary E. Monahan
Mary E. Monahan
*Attorney for*
*Plaintiffs-Appellants*

CERTIFICATE OF COMPLIANCE

WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS,
AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because:

☑     This brief contains 11,403 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), or

☐     The brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii).

2.     The brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because:

☑     This brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Century font, or

☐     The brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

/s/ Mary E. Monahan
Mary E. Monahan
*Attorney for*
*Plaintiffs-Appellants*
Dated:  October 14, 2014

64

# CIRCUIT RULE 28(a)(12) ADDENDUM

# In the United States Court of Federal Claims

**No. 09-283 T**

**LOUIS J. BALESTRA, JR. and
PHYLLIS M. BALESTRA**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Memorandum Opinion and Order, filed May 31, 2014, granting defendant's motion for summary judgment and denying plaintiffs' cross-motion,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that judgment is entered in favor of defendant.

Hazel C. Keahey
Clerk of Court

**June 5, 2014**          By:     s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs.  Filing fee is $505.00.

# In the United States Court of Federal Claims

No. 09-283T
(Filed May 31, 2014)
NOT FOR PUBLICATION

```
* * * * * * * * * * * * * * * * * * * * * * * *
                                        *
                                        *
LOUIS J. BALESTRA, JR. and              *
PHYLLIS M. BALESTRA,                    *
                                        *
              Plaintiffs,               *
                                        *
       v.                               *
                                        *
THE UNITED STATES,                      *
                                        *
              Defendant.                *
                                        *
* * * * * * * * * * * * * * * * * * * * * * * *
```

## MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

This is a suit for a refund of $3285.26 of Federal Insurance Contribution Act (FICA) taxes, imposed by 26 U.S.C. § 3101. At bottom, this case concerns a simple issue: whether the Balestras should have to pay FICA taxes on deferred compensation to which Mr. Balestra had a vested right but, due to the bankruptcy of his employer, he will never receive. Plaintiffs claim that the relevant statutes do not allow the FICA taxation of amounts which are never paid out to an employee. On the facts of this case, the Court disagrees. Therefore, as explained below, Plaintiffs' Cross-Motion for Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED**.[1]

---

[1] Defendant also filed a motion to amend its answer to assert an equitable recoupment defense. Def.'s Mot. for Leave to Am. Answer. Because that defense would only have been relevant if the plaintiffs had prevailed, that motion is **DENIED** as moot.

# I. BACKGROUND

The plaintiffs in this case are Louis J. Balestra, Jr., and Phyllis M. Balestra, a husband and wife who filed a joint tax return for tax year 2004. Compl. at 6. Because this suit concerns Mr. Balestra's retirement benefits, the plaintiffs will be referred to singly as plaintiff or Mr. Balestra. Plaintiff was employed as a pilot by United Airlines (United) from January 29, 1979, until his retirement on October 1, 2004. Def.'s Proposed Findings of Uncontroverted Fact (D.P.F.) ¶¶ 1, 20; Pls.' Resp. to Def.'s Proposed Findings of Uncontroverted Facts and Pls.' Additional Proposed Findings of Uncontroverted Fact (Pls.' Resp. to D.P.F) ¶¶ 1, 20. This case concerns the FICA tax treatment of Mr. Balestra's retirement benefits. Under 26 U.S.C. § 3121(v)(2) (Section 3121(v)(2)), and the regulations under that section, the full present value of Mr. Balestra's future retirement benefits was included in the FICA tax base in the year of his retirement. 26 U.S.C. § 3121(v)(2); 26 C.F.R. § 31.3121(v)(2)-1(a)(2); D.P.F. ¶¶ 24–25; Pls.' Resp. to D.P.F ¶¶ 24–25.

This tax treatment, where benefits are taxed although deferred, is referred to as the "special timing rule." This is to distinguish it from the "general timing rule" for FICA taxation, which imposes tax in the year in which the wages are actually paid. *See* 26 U.S.C. § 3101(b) (2000);[2] 26 U.S.C. § 3121(v)(2). United had entered bankruptcy proceedings in 2002, two years before plaintiff's retirement. Pls.' Resp. to D.P.F ¶ 28; Def.'s Resp. to Pls.' Proposed Findings of Uncontroverted Fact ¶ 28 (Def.'s Resp. to P.P.F.). As a result of these proceedings, United's obligation to pay plaintiff's deferred compensation was discharged, with the majority of the benefits never having been paid. Pls.' Resp. to D.P.F ¶ 79; Def.'s Resp. to P.P.F. ¶ 79. In 2010, United made the final payments required under its bankruptcy reorganization plan; thus, Mr. Balestra will not receive any additional benefits from this retirement plan. Pls.' Ex. 40 at 3.

Because United withheld FICA tax from Mr. Balestra based on a present value calculation of his retirement benefits at the time of his retirement, Mr. Balestra effectively paid Hospital Insurance (HI) wage tax on wages he will never receive. In total, plaintiff paid HI tax on $289,601.18 worth of nonqualified deferred compensation, of which he would only receive $63,032.09. He paid $4,199.22 of FICA tax on these benefits, which reflects the 1.45% HI tax rate applied to the $289,601.18 present value of the benefits.[3] Pls.' Resp. to D.P.F ¶ 25; Def.'s Resp. to

---

[2] To avoid confusion, this opinion cites and quotes the provision in force at the time Mr. Balestra's benefits were taxed. Due to the subsequent enactment of tax increases, this provision has been modified and the relevant language, although substantively unchanged, is now found at 26 U.S.C. § 3101(b)(1) (2012).

[3] For reasons discussed below, plaintiff did not pay Social Security tax on his deferred compensation.

P.P.F. ¶ 25. Plaintiff's dissatisfaction with this tax treatment produced this suit for a refund of $3285.26.[4]

A bit of background on FICA taxes is necessary to contextualize this dispute. FICA taxes consist of two components, the Social Security tax and the Medicare, or HI, tax. 26 U.S.C. § 3101(a)–(b). Both taxes are collected through a withholding mechanism. 26 U.S.C. § 3102(a).[5] The Social Security component of the tax is limited to wages below a certain amount. The amount below this limit is referred to as the "Social Security Wage Base." *See* 26 U.S.C. § 3121(a)(1). Any compensation in excess of this base generates no Social Security tax liability. By contrast, the HI component is uncapped, and as such it is applied against the entirety of an employee's wages. The interaction of the Social Security Wage Base, the timing of the tax liability, and the unlimited nature of the HI tax, are integral to understanding this dispute. Plaintiff did not pay Social Security tax on his deferred compensation, because his other compensation in the year of his retirement already exceeded the Social Security Wage Base. *See* D.P.F. ¶ 26 (stipulating that Mr. Balestra's other compensation in the year in 2004 was $213,782.53); Office of the Commissioner[:] Cost-of-Living Increase and Other Determinations for 2004, 68 Fed. Reg. 60437-01 (October 22, 2003) (establishing $87,900 as the Social Security Wage Base for 2004).

Motions for summary judgment have been filed by both sides under Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), and defendant has moved for leave to amend its answer under RCFC 15(a). Defendant argues that the special timing rule was properly applied to Mr. Balestra's benefits, and, as neither the statutes nor the regulations provide for a refund for FICA taxes imposed on this sort of wages that are never received, the Court should grant summary judgment in its favor. Def.'s Mot; Def.'s Reply in Supp. of Mot. for Summ. J. and Resp. to Pls.' Cross. Mot. Summ. J. (Def.'s Reply). Defendant argues that an item need not represent income if it is to be taxed under the special timing rule; that subsequent events do not alter the FICA tax treatment of nonqualified deferred compensation; and that the challenged regulations are, accordingly, valid. Def.'s Reply at 3–23.

Plaintiff, by contrast, argues that he is entitled to summary judgment because the regulations enacted under Section 3121(v)(2) are arbitrary and

---

[4] This amount reflects the FICA tax attributable to the portion of the deferred compensation Mr. Balestra did not receive.

[5] The FICA regime also includes another set of essentially identical taxes that are imposed on the employer, also determined as a fraction of the wages of their employees. 26 U.S.C. § 3111(a)–(b). The employer component of FICA is not at issue in this case.

-3-

irrational in not providing for a "true-up" (i.e., refund) in the event of plan-failure, nor allowing the risk of nonpayment to be included in the calculation of the present value of deferred compensation subject to tax under the special timing rule. Pls.' Mem. in Support of Cross Mot. for Summ. J. and Opposition to Def.'s Mot. for Summ. J. (Pls.' Br.) at 28–39. For the reasons that follow, the Court finds plaintiff is not entitled to a refund.

## II. DISCUSSION

### A. Legal Standards for Motions for Summary Judgment

Summary judgment is appropriate only if, based on materials in the record, a "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a), (c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Sweats Fashions, Inc. v. Pannill Knitting Co.*, 833 F.2d 1560, 1562–63 (Fed. Cir. 1987); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 743 (2005). Material facts are those "that might affect the outcome of the suit under the governing law." *Liberty Lobby*, 477 U.S. at 248. A dispute over facts is genuine "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Id.*

### B. The Motions for Summary Judgment

This case does not concern any constitutional limits on the taxing power of the Congress. Rather, the issue is *how* Congress exercised this power. Plaintiff maintains that when Congress mandated that certain nonqualified deferred compensation "be taken into account" as wages for FICA purposes under the special timing rule of Section 3121(v)(2), it did not intend that amounts that are never received as income should be taxed. The government argues to the contrary. As we shall see, defendant has the better of the argument.

FICA taxes are generally imposed on wages in the year that they are actually or constructively paid by employers to employees. *See* 26 U.S.C. § 3101; 26 C.F.R. § 31.3121(a)-2(a). Wages are defined as "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash," with several exceptions that are not relevant for our purposes. 26 U.S.C. § 3121(a). Employees are liable for the FICA tax imposed on their wages. *See* 26 U.S.C. § 3101. As explained below, the special timing rule provides that certain wages can be taxed before they are received by employees. The special timing rule does not itself impose any tax; rather, it merely affects the timing of the FICA tax imposed by the relevant operational provision. The operational provision of the employee portion of the Social Security wage tax provides:

-4-

[T]here is hereby imposed on the *income* of every individual a tax equal to the following percentages of the wages (as defined in section 3121(a)) received by him with respect to employment (as defined in section 3121(b))—

> (6) with respect to wages received after December 31, 1985, the rate shall be 1.45 percent.

26 U.S.C. § 3101(b) (2000) (emphasis added).[6]

The special timing rule displaces the normal rule, 26 U.S.C. § 3101(b), that wages are taken into account when they are actually or constructively paid. The special rule provides:

> **(2) Treatment of certain nonqualified deferred compensation plans.—**
>
> **(A) In general.** --- Any amount deferred under a nonqualified deferred compensation plan shall be taken into account for purposes of this chapter as of the later of ---
>
> > **(i)** when the services are performed, or
> > **(ii)** when there is no substantial risk of forfeiture of the rights to such amount.

26 U.S.C. § 3121(v)(2)(2012). Thus, these provisions on their face appear to permit amounts to be taxed before they are actually or constructively paid.

The regulations implementing Section 3121(v)(2) reflect this approach, as they permit nonqualified deferred compensation benefits to be taxed before they are paid. *See* 26 C.F.R. § 31.3121(v)(2)-1. They provide that deferred compensation benefits taxed under the special timing rule are taxed at their "present value," which is computed with reference to actuarial projections concerning life expectancy and a discount rate to account for the time value of money. 26 C.F.R. § 31.3121(v)(2)-1(c)(2)(ii) (2013). Critical to this case, however, the "present value" of retirement benefits cannot be

> discounted for the probability that payments will not be made (or will be reduced) because of the unfunded status of the plan, the risk associated with any deemed or actual investment of amounts deferred

---

[6]  The provision which imposes the Social Security tax uses identical operative language, but a different tax rate. *See* 26 U.S.C. § 3101(a).

under the plan, the risk that the employer, the trustee, or another
party will be unwilling or unable to pay, the possibility of future plan
amendments, the possibility of a future change in the law, or similar
risks or contingencies.

*Id.*[7]

One of the two statutory factors setting the time for taxation of these
benefits, the absence of a "substantial risk of forfeiture," 26 U.S.C.
§ 3121(v)(2)(A)(ii), is determined under the regulations "in accordance with the
principles of section 83 and the regulations thereunder." 26 C.F.R. § 31.3121(v)(2)-
1(e)(3). The referenced tax code provision, concerning the transfer of property,
provides: "The rights of a person in property are subject to a substantial risk of
forfeiture if such person's rights to full enjoyment of such property are conditioned
upon the future performance of substantial services by any individual." 26 U.S.C.
§ 83(c)(1). And the regulations add an additional, non-statutory factor that may
delay the imposition of FICA taxes, which is whether the deferred amount is
reasonably ascertainable. 26 C.F.R. § 31.3121(v)(2)-1(e)(4). Under this concept

an amount deferred is considered reasonably ascertainable on the first
date on which the amount, form, and commencement date of the
benefit payments attributable to the amount deferred are known, and
the only actuarial or other assumptions regarding future events or
circumstances needed to determine the amount deferred are interest
and mortality.

26 C.F.R. § 31.3121(v)(2)-1(e)(4)(i)(B) (2013).

In sum, the regulations provide for the taxation of deferred compensation
based on a present value calculation that does not discount the promised benefits
for the risk of employer default. Nor do the regulations explicitly allow refunds in
the event of nonpayment due to plan failure, unlike other circumstances. *Cf.* 26
C.F.R. § 31.3121(v)(2)-1(e)(7), Ex. 12 (showing an employer refund when election to
pay taxes before amounts were reasonably ascertainable resulted in an
overpayment); 26 C.F.R. §  31.3121(v)(2)-1(f)(2)(iii) (providing for employer refund
when amount deferred is overestimated and taxes are paid earlier than required).

Plaintiff makes two principal arguments in support of his refund claim, both
focusing on the description of the relevant FICA taxes as being "imposed on the

---

[7] These regulations apply only to so-called "nonaccount balance plans" which
include plaintiff's nonqualified plan. 26 C.F.R. § 31.3121(v)(2)-1(c)(2)(i)
(2013).

income of every individual" in Section 3101(b). His first contention is that the FICA tax base is thus limited to items that would be considered income, of which wages are merely a subset. Thus, even if wages are defined to include deferred compensation, they cannot be taxed before they could be considered income. *See* Pls.' Br. at 12-28. His second contention is that even if Section 3121(v)(2) would allow his deferred benefits to be taxed before they were reduced to income, accrual accounting principles must apply to defer the taxation when the realization of the benefits is doubtful and to provide for an adjustment when amounts included in the FICA tax base are never received. *Id.* at 28-39. Subsumed in this second contention is the argument that the use of a risk-free discount rate to value future benefits promised by an employer in bankruptcy is arbitrary and capricious. *Id.* at 33-35. These contentions are pitched as questions of statutory interpretation, and do not rest on any alleged constitutional infirmities or restrictions.

The starting point for our analysis is the language of the provision that imposes FICA taxes. That provision, Section 3101(b), provides: "[i]n addition to other taxes, there is hereby imposed on the *income* of every individual a tax equal to the following percentages of the wages . . . received by him." 26 U.S.C. § 3101(b) (2000) (emphasis added). As we have seen, Section 3121(v)(2)(A) states that "[a]ny amount deferred under a nonqualified deferred compensation plan shall be taken into account" when services are performed or there no longer exists a substantial risk of forfeiture of the rights to the deferred amount, whichever occurs later. 26 U.S.C. § 3121(v)(2)(A)(i)-(ii).

Plaintiff asserts that the use of the words "income of every individual" means that FICA taxes are a type of income tax which is computed with reference to "wages received." Pls.' Br. at 14. Plaintiff contends that "wages" are a subset of "income" in the formulation of Section 3101(b), and thus if an item is not "income" it must, by definition, also not be "wages" subject to tax under FICA. *Id.* at 16. Mister Balestra contends that the use of the words "wages received" was a deliberate choice on the part of Congress to defer taxation until actual receipt. *Id.* at 15.[8] Defendant disputes this contention, arguing that something can be taxed as wages when it is not income and that Section 3121(v)(2) would be meaningless if plaintiff's position were to prevail. Def.'s Reply at 9–14.

The tax code makes plain that, whatever the case might have been in the past, remuneration for employment can be "wages" for FICA purposes although not

---

[8] It is evident that by treating certain deferred compensation as wages as of a particular point in time, the effect of Section 3121(v)(2) is to deem these "wages" to be received as of that date. Thus, Mr. Balestra's deferred benefits were "received" within the meaning of Section 3101(b) the day he retired, even though he never actually received a substantial fraction of said "wages."

"income" for income tax purposes. *See, e.g.*, 26 U.S.C. § 3121(a) ("Nothing in the regulations prescribed for purposes of chapter 24 (relating to income tax withholding) which provides an exclusion from 'wages' as used in such chapter shall be construed to require a similar exclusion from 'wages' in the regulations prescribed for purposes of this chapter."). Thus, the use of the phrase "imposed on the income" does not appear to limit wages to items that would also be considered income, but at most places a limit on the extent of taxes collected from an employee --- these cannot be greater than income. Moreover, the tax code is the creation of Congress, which can define its own terms. Congress can define "income" or "wages" however it likes, and can label a tax as falling on "income" even if the tax would not be authorized under the Sixteenth Amendment, provided it is otherwise lawful (for instance, as an excise tax under Article I, Section 8). *See Murphy v. IRS*, 493 F.3d 170, 173 (D.C. Cir. 2007). The Court agrees with the government that Section 3121(v)(2) *must* impose taxes on wages before they are considered income, otherwise it would be emptied of meaning. Readings that render a statute meaningless, in whole or in part, are to be avoided. *See Beck v. Prupis*, 529 U.S. 494, 506 (2000).

The plain meaning of Section 3121(v)(2) is to treat certain benefits as taxable FICA wages before they have become part of an employee's income.[9] Plaintiff's secondary argument is that Congress, by imposing this portion of FICA taxes on a non-cash basis, must have meant to employ an accrual accounting basis. Thus, while the provision would allow benefits to be taxed prior to receipt, to give proper homage to the term "income" it must implicitly require that some sort of deduction or adjustment must be allowed when it can be determined that the benefits will never be received. Plaintiff faults the regulations for lacking such features, and also for not deferring recognition of the wages while their ultimate receipt remains doubtful. Pls.' Br. at 28–33, 36–39.

While it is true that Congress accelerated the taxation of deferred benefits such as those promised Mr. Balestra, the trigger it selected --- "when there is no substantial risk of forfeiture of the rights to such amount," 26 U.S.C. § 3121(v)(2)(A)(ii) --- employs a term of art from another statute which essentially means the employee has satisfied all of the requirements under his employment contract to earn the right to the deferred compensation. *See* 26 U.S.C. § 83(c)(1).[10]

---

[9] For what it is worth, the author of the amendment which became Section 3121(v)(2) clearly believed it would subject benefits to tax before they were paid. See 129 CONG. REC. 6134 (1983).

[10] While legislative history is often of dubious value in construing acts of Congress, it has its greatest claim to legitimacy when it concerns a legislative term of art or when it is found in a conference report --- which is often the document actually adopted by each house to pass the concerned legislation. Both of these factors are present regarding "substantial risk of forfeiture," which the Conference Report

-8-

While this choice may seem odd, as the statute concerned property received and the regulations issued under it expressly exclude "an unfunded and unsecured promise to pay money" from its ambit, 26 C.F.R. § 1.83-3(e), the borrowed concept does not concern any risks of nonpayment. Congress chose to incorporate this statutory provision, rather than accrual concepts developed under common law.

Moreover, there is no reason to believe that by taxing deferred compensation under a provision that references "income," Congress intended to silently incorporate the features of accrual accounting. Congress knows how to incorporate these principles when it desires, and it has not done so here. *See* 26 U.S.C. § 446(c)(2) (indicating that accrual accounting is a permissible accounting system). In addition, Congress also knows how to provide relief when an early inclusion leads to the taxation of an item which is never paid. It has provided such relief by offering deductions for previously taxed, but never received, business income. 26 U.S.C. § 166. Congress also knows how to expressly disallow such relief. *See* 26 U.S.C. § 83(b) (expressly disallowing a deduction for property transferred in connection with employment which the taxpayer elected to have taxed while still subject to a substantial risk of forfeiture and which was subsequently forfeited).

To be sure, in enacting Section 3121(v)(2), Congress did expressly consider some future consequences that would follow from having already "taken into account" the deferred compensation in question. But this provision concerns the actual receipt of these benefits by the employee, as they "shall not thereafter be treated as wages for purposes of this chapter." 26 U.S.C. § 3121(v)(2)(B). On the question of the treatment of benefits that are not ultimately received, the statute is silent. Given the detailed machinery that would need to be employed to accomplish such relief, including such matters as how it is determined that the benefits will not be received and the limitations period that would apply, the Court can hardly fault the Department of the Treasury for not inferring from congressional silence that such a regime was desired. While the creation of such a regime might be allowed, *see* 26 U.S.C. §§ 6402, 7805, whether it is *required* is another matter.

The adopted regulations permit the taxation of benefits which are deferred but never paid, a matter on which the statute is at best (from the perspective of the plaintiff) silent. These regulations must be upheld if they are within the zone of reasonableness. *See Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 713 (2011) (concluding that IRS regulations are entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which requires courts to defer to the reasonable interpretation of the

---

explained to be "within the meaning of sec. 83." H.R. REP. NO. 98-47, at 147 (1983) (Conf. Rep.).

agencies charged with implementing them).[11] As we have seen, the statute requires FICA taxation of deferred compensation before it can be known whether the promised benefits will ever be paid out to an employee. It might have been wiser to have selected as a trigger something other than there being "no substantial risk of forfeiture" --- and instead considered the financial solvency of the employer --- or to have deferred taxation while an employer is in bankruptcy, rather than merely until promised benefits are "reasonably ascertainable."

But these are matters for law makers, not judges --- suboptimal tax laws are still valid tax laws. (Title 26 of the United States Code would be a good deal shorter if the unwise tax laws could be purged by the judiciary.) The Treasury Department recognized the taxing of nonqualified deferred compensation "often requires difficult valuation of future benefits" and "the practical administrative problems that can be encountered by taxpayers in this area," and opted for an approach it believed "to be workable, to minimize complexity, and to provide appropriate flexibility for taxpayers." FICA Taxation of Amounts Under Employee Benefit Plans 61 Fed. Reg. 2194-01, 2195 (January 25, 1996). In so doing, it elected not to provide a mechanism for refunding taxes that were based on deferred benefits that were promised, but not received. Under *Chevron*, the Court cannot conclude that this approach was unreasonable.[12]

Plaintiff's final, and perhaps strongest, argument concerns the regulatory definition of present value. He argues that it was entirely unreasonable for the Treasury to forbid a bankrupt employer from discounting its unsecured promises for the risk of non-payment when calculating the present value of those promises. Pls.' Br. at 29. As noted above, the regulations clearly disallow any such discount. 26 C.F.R. § 31.3121(v)(2)-1(c)(2)(ii). Plaintiff explains that courts generally treat the concept of present value as including both a credit risk discount and a time value of money adjustment. *Id.* at 33–36 (citing *Estate of Ridgely v. United States*, 180 Ct. Cl. 1220 (1967); *Navajo Tribe of Indians v. United States*, 176 Ct. Cl. 320, 344 (1966); *Energy Capital Corp. v. United States*, 302 F.3d 1314, 1333 (Fed. Cir.

---

[11] Plaintiff does not dispute that the regulations are entitled to *Chevron* deference. See Pl.'s Mot. at 29 (arguing that the regulations under Section 3121(v)(2) are invalid under *Chevron* "step two" because they are "arbitrary and capricious" and thus not "a reasonable" interpretation of the statute).

[12] The Court notes one advantage of the Section 3121(v)(2) regime, roughly offsetting the detriment of the HI tax falling on amounts never received, is that deferred compensation is deemed received while an employee is still working and may have income exceeding the Social Security Wage base. Plaintiff, for instance, paid $4,199.22 in FICA taxes on $63,032.09 in deferred compensation actually received. This corresponds to roughly a 6.7% tax rate, as compared to a combined Social Security and HI rate of 7.65%. *See* 26 U.S.C. § 3101(a)–(b) (2000).

-10-

2002)).  Mister Balestra contends that this regulation is arbitrary and invalid under *Chevron* step two, relying on the Federal Circuit's decision in *Dominion Resources, Inc. v. United States*, 681 F.3d 1313 (Fed. Cir. 2012).  *See* Pls.' Supp'l Br. at 1-3, ECF No. 79; Pls.' Resp. Supp'l Br. at 10–12.

Unlike *Dominion Resources*, in which a Treasury regulation contradicted the rule prescribed by Congress, *see Dominion Res.*, 681 F.3d at 1317-19, the statute interpreted in our case says nothing about how any "amount deferred" is to be calculated.  *See* 26 U.S.C. § 3121(v)(2)(A).  Given that amounts "deferred" are, by definition, to be received in the future, were the Treasury to require these amounts to be calculated based on the nominal value of the future payment stream with no discount whatsoever, this would seemingly contradict the statute's purpose.  But with no guidance from Congress on how to calculate present value, no rule is violated by the Treasury's choice of a present value method.[13]

Plaintiff's argument would have more force if he could identify some off-the-rack rule regarding present value that the Treasury typically employs and from which it deviated, without explanation, in crafting the regulations under Section 3121(v)(2).  But absent any such uniform practice, and considering the clear, contemporaneous explanation of the rationale for this valuation method --- namely minimizing administrative costs and complexities, *see* 61 Fed. Reg. 2194-01 at 2195 --- the Court cannot say the choice of this method was irrational.  The decision of the Treasury Department to avoid the complicated and strategic-behavior-enabling use of risk-adjusted discount rates cannot be said to be unreasonable.  Under the deference due the regulations per *Chevron*, as applied to plaintiff they must stand.[14]

Thus, the statute was properly applied to the benefits promised Mr. Balestra under United's nonqualified deferred compensation plan.  Sections 3101(b) and 3121(v)(2) required these benefits to be calculated and taxed when he retired, but do not require the use of a risk-adjusted discount rate nor a refund corresponding to the benefits plaintiff never received.

---

[13]  The Court notes that even a risk-free rate could *underestimate* benefits in an employee's favor when, for example, the inflation premium proves to be excessive.

[14]  The present value regulation would also be rational under the test from *Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Company*, 463 U.S. 29, 43 (1983).  Not only was the contemporaneous explanation sufficient, but the Treasury had not "entirely failed to consider" the issue of discounting for credit risk, and instead expressly rejected the option.  *Id.*

-11-

### III.   CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is **GRANTED**, plaintiff's cross-motion for summary judgment is **DENIED**, and defendant's motion to amend its complaint is **DENIED**.  The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge